[No. 37665-2-II.   Division Two.   August 25, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. DENNIS KENNEALY, *Appellant*.

862

*Jodi R. Backlund* and *Manek R. Mistry* (of *Backlund & Mistry*), for appellant.

*Edward G. Holm, Prosecuting Attorney*, and *Carol L. La Verne, Deputy*, for respondent.

¶1 VAN DEREN, C.J. — Dennis Kennealy appeals his convictions for first degree child rape, first degree child molestation, fourth degree assault with sexual motivation, and communication with a minor for immoral purposes. He maintains that the trial court erred in finding one of the child witnesses, S.J., competent. He also contends that the trial court erred in admitting multiple child hearsay statements and ER 404(b) evidence of prior sexual misconduct with other children. Finally, Kennealy argues that the prosecutor committed misconduct by repeatedly referring to the prior misconduct evidence as part of a common scheme or plan during closing argument. We find no error and affirm.

## FACTS

¶2 In the summer of 2007, two minor girls, K.W. and M.Y., lived with their mother; another minor boy, S.J., was visiting his grandmother during that same time. S.J.'s grandmother and K.W. and M.Y.'s mother lived in the same apartment complex as Kennealy, in Yelm, Washington. That summer, S.J. was six years old, K.W. was seven, and M.Y. was five.

¶3 After a child sexual abuse investigation that summer, the State charged Kennealy with one count of first degree child rape involving S.J., one count of first degree child molestation involving M.Y.; one count of fourth degree assault with sexual motivation involving K.W., and one count of communication with a minor of immoral purposes

involving K.W. The trial court held competency and child hearsay admission hearings before trial. The trial court found each child competent to testify, admitted multiple hearsay statements to support each child's allegation against Kennealy, and admitted evidence of Kennealy's prior sexual misconduct with four other children.

## I. S.J.'s COMPETENCY

### Competency

¶4 Following a competency hearing, the trial court found that all of the children were "remarkable in their ability to remain focused in the courtroom and relatively relaxed"; that the children each gave complete accounts of incidents involving Kennealy; and that they each understood the obligation to tell the truth, exhibiting their best efforts to do so. Report of Proceedings (RP) (Feb. 19, 2008) at 66. It concluded that all three were competent to testify. Kennealy challenges the trial court's conclusion that S.J. was competent to testify against him.

¶5 At the competency hearing, the trial court learned that S.J. takes medicine for attention deficit hyperactivity disorder (ADHD) and that he sometimes has trouble with sequence. S.J. was able to testify accurately about his age, whom he lives with, his birthday, his school, and his teacher's name. And despite S.J.'s confusion about some of the details surrounding the incident at issue, the trial court concluded, after hearing S.J.'s testimony, that he was competent because he listened carefully to the questions and attempted to provide an accurate answer. The trial court also noted that S.J. may have withheld information during some interviews and may not have always told the truth. But at the conclusion of the competency hearing, the trial court found that he (1) understood the obligation to speak the truth, (2) had sufficient memory of the incident, and (3) had adequate mental capacity at the time of the incident to allow him to testify about it. S.J. was also able to understand questions on direct and cross-examination.

¶6 An officer who interviewed S.J. testified at trial that S.J. was observant, recognized where he was when they were driving together, and spelled "Yelm." RP (Mar. 10, 2008) at 376-77. The officer also went through a "truth-and-lie" test by asking S.J. questions and concluded that S.J. was always able to answer the questions. RP (Mar. 10, 2008) at 378-79.

¶7 At trial, S.J. testified that he knew he would get in trouble if he told a lie. When asked if it was a truth or a lie that the prosecutor had an elephant on his head, S.J. said it was a lie because he did not have one. And when the prosecutor asked S.J. if he could promise to tell the truth and not tell any lies, S.J. said that he promised to tell the truth. But S.J. had trouble with the word "promise." RP (Mar. 5, 2008) at 77. When the prosecutor asked S.J., "[I]f I promise you I will give you a cookie, do I have to give you a cookie?" and S.J. responded, "No." RP (Mar. 5, 2008) at 77.

¶8 S.J. testified at trial that he had been inside of Kennealy's apartment twice to ask for popsicles. He also testified that he dreamed about Kennealy having popsicles. Before trial, S.J. said that the first time he went there he took a bath, but at trial, he said that he had made up the story about taking a bath. S.J. also stated at one point that Kennealy had a Nemo fish on top of his television and that he took it to his grandmother's house and took a bath with it. An officer confirmed that Kennealy does have a Nemo toy in his apartment. But S.J. later said that he made up the story about taking it.

¶9 S.J. testified at trial that the second time he went into Kennealy's apartment was around July 4, 2007.[1] S.J. testified that he went to Kennealy's apartment to get a popsicle. S.J. told a police officer that Kennealy gave him a cappuccino, which Kennealy confirmed. S.J. testified that while he was inside, Kennealy removed S.J.'s pants, put them on the bed, and "suck[ed] [his] private parts." RP (Mar.

---

[1] S.J. did not seem to know exactly what day or what time of day he went to the house.

5, 2008) at 85-86. When the prosecutor asked S.J. how he knew that Kennealy sucked his private parts, S.J. responded, "I don't know. I just dreamed about it all the time." RP (Mar. 5, 2008) at 87.

¶10 S.J. was confused about where in Kennealy's apartment this incident took place. He told an officer in his first interview that the incident had occurred in the living room, but in another interview, he said that it had occurred in the bedroom. At one point, S.J. said that the bed was rectangular, and he later said that it was round. S.J. also said that the floors were wood, but they were carpeted. And he told a police officer that the room had doors like "Eddie" and then denied saying that. RP (Feb. 4, 2008) at 112, 220-21. The bedroom does not have a round bed or wood floors.

## II. HEARSAY

### A. S.J.

¶11 The trial court admitted statements that S.J. made to his mother, his sister, and a police officer around the time of the incident after finding that they met the *Ryan*[2] reliability factors.[3] It explained that S.J.'s statements to his mother and sister were spontaneous, close to the incident, appeared consistent, and there was no evidence of motive or bias to misrepresent facts. The trial court similarly found that there was a sufficient level of reliability and trustworthiness with the statements to the officer and that it was insignificant that S.J. was in a "time out" when he made the statement to his sister. RP (Feb. 19, 2008) at 81.

¶12 At the child hearsay hearing, S.J.'s sister said that when S.J. made the statement, he was in trouble for something and was sitting on the floor near her while she was talking on the phone with a friend. She told her friend that Kennealy was acting weird. S.J. then told his sister

---

[2] *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 197 (1984).

[3] S.J. once contended that he did not tell the police or his parents about the incident.

that Kennealy sucked his "knuckles"[4] and "pointed to his private parts." RP (Feb. 4, 2008) at 185-86. S.J. told his sister not to tell anyone because it was a secret. But S.J.'s sister called the police, and a police officer came to their grandmother's apartment.

¶13 The trial court also admitted S.J.'s hearsay statements to the police officer. This included evidence that S.J. nodded in agreement as his sister told the officer what S.J. had just told her. S.J. told the officer in two different interviews the same thing that he had told his sister. Specifically, S.J. told the officer that Kennealy had pulled his pants down and "sucked his knuckles," and showed the officer how Kennealy had used his mouth to do so. RP (Mar. 10, 2008) at 396. S.J. also told the officer that Kennealy had asked him not to tell anyone and that nobody else was in the room when it happened.

### B. M.Y.

¶14 M.Y. was six years old at the time of trial. She testified that she had been inside Kennealy's apartment only a couple of times but that he gave her popsicles "[a] lot of times." RP (Mar. 5, 2008) at 130. She said that Kennealy touched her once on her bottom, underneath her clothes, and between her legs while she was standing on the stairs outside of his apartment. M.Y. testified at the child hearsay hearing that the touching occurred on a sunny day, outside, while her sister, K.W., was present.[5]

¶15 The trial court also admitted hearsay statements M.Y. made to her father, a police officer who investigated the incident, and Nancy Young, a child sexual assault interviewer. The trial court found that M.Y.'s statements to her father were prompt, spontaneous, and reliable. It

---

[4] S.J.'s mother testified that S.J. told her that Kennealy used the word "knuckles" for "penis" and that she had never heard S.J. use that term before the incident. RP (Feb. 19, 2008) at 46; RP (Mar. 4, 2008) at 34. S.J. later said that he made up the word himself and that it meant penis.

[5] K.W. saw M.Y. and Kennealy by the stairs, but she did not see Kennealy touch M.Y.

admitted her statements to the officer because his interview was close in time to the incident and admitted the statements to Young because the clinical setting in which Young interviewed M.Y. enhanced the reliability of her statements and encouraged spontaneity.

¶16 M.Y.'s father testified that he spoke with M.Y. after he learned of the allegations against Kennealy. He asked M.Y. whether she knew Kennealy; she responded that she hated him, that he lives by the playground, and that he gave them popsicles. When asked why she hated Kennealy, M.Y. told her father that he touches them and M.Y. put her hands down the front of her pants indicating or suggesting that Kennealy touched her there. M.Y.'s father contacted the police.

¶17 When the officer interviewed M.Y., M.Y.'s mother was present. The officer testified that M.Y. told him that Kennealy had touched her and pointed to her crotch. The officer asked M.Y. to tell him about it, and she explained that when she and Kennealy were by the stairs, Kennealy reached down and put his hand underneath her dress; "on her privates." RP (Mar. 10, 2008) at 414-15. M.Y. made it clear to the officer that Kennealy had touched her underneath her underwear and that he had put his finger inside of her vagina.

¶18 Young also testified that M.Y. told her that Kennealy was mean to her but that he did not hurt her. Young said that when she asked M.Y. if Kennealy had done something, M.Y. responded yes, but she was unable to point to what part of her body he had done something to.

¶19 Although M.Y. testified that she told her mother and sister about the touching, her mother testified that M.Y. did not approach her about the incident. When describing M.Y. at the child hearsay hearing, M.Y.'s mother "was going to say conniving," but then clarified that M.Y. is smart and thinks outside the box. RP (Feb. 4, 2008) at 160.

## C. K.W.

¶20 K.W. was eight years old around the time of the incident. K.W. knew Kennealy because he talked to her on the playground and had given her popsicles, punch, and a balloon. K.W. testified that once when she went to Kennealy's apartment to use the bathroom, he told her that he wanted to come into the bathroom with her and watch her use the toilet. She also testified that while she was playing on the playground, Kennealy told her that he wanted to see what was underneath her underwear. She testified that Kennealy asked her for hugs and that he once picked her up to hug her and touched her bottom under her dress but over her underwear. The trial court admitted hearsay statements K.W. made to her mother, a police officer, and Young after finding that the statements were spontaneous.

¶21 K.W.'s mother spoke with K.W. after being told by her landlord that Kennealy had done bad things to children. K.W.'s mother told K.W. that she would not be in trouble and to just tell her what happened. K.W.'s mother asked her if anything with Kennealy was weird or uncomfortable to her. K.W. responded that Kennealy said he liked K.W.'s underwear and wanted to see underneath them and that he kissed her cheek a lot. K.W. also told her mother that Kennealy watched her while she played at the park and that he wanted to come in the bathroom with her and watch her use the toilet when she went to the bathroom at his apartment.

¶22 A police officer interviewed K.W. while her mother was present, and K.W. told him that she had heard from other girls in the apartment complex that Kennealy was a "bad guy" and that she agreed. RP (Mar. 10, 2008) at 407. When the officer asked K.W. what she meant, K.W. told the officer that Kennealy hugged and kissed her a lot; that he had touched her bottom and held her against him; and that he followed her to the bathroom and asked if he could watch, stating that he would really like to watch. The officer

also testified that K.W. said that Kennealy had told her that she was wearing nice underwear and that he wanted to see underneath them. K.W. told the officer that she did not tell anyone about it when it happened because she was afraid she would get in trouble for going to Kennealy's apartment.

¶23 The trial court also admitted statements from Young's interview with K.W., during which K.W. stated that Kennealy tried to touch her on her "private[ ] [part]"; and when Young asked her which part, she pointed to her crotch. RP (Mar. 5, 2008) at 235-36. K.W. contended that Kennealy had tried to touch her more than once, but she was not sure how many times.

III. PRIOR MISCONDUCT TESTIMONY

¶24 The trial court also admitted evidence of Kennealy's uncharged prior misconduct involving his daughter and three of his nieces, finding that the evidence showed that Kennealy had a common scheme or plan to molest children. The trial court found the incidents were "remarkably similar and seemed consistent" with the evidence in the case before it; it admitted the statements for the limited purpose of proving a common scheme or plan to sexually molest young children, not to prove character. RP (Mar. 10, 2008) at 305-06, 313. The trial court reviewed the testimony each witness would offer and explained why the testimony described incidents similar to the incidents in this case. The trial court noted that the testimony was strongly probative because the victims were young at the time of the incidents and when they testified, they were vulnerable, and the incidents took place when the children were separated from other witnesses.

¶25 Before each witness testified, the trial court told the jury that any evidence of uncharged allegations could not be considered to prove the character of the defendant in order to show that he acted in conformity with it, but the jury could consider it only to determine whether or not it proved a common scheme or plan. The court also provided a written instruction repeating this limitation on the evidence at the close of trial.

¶26 Kennealy's daughter testified that, when she was around seven years old, she visited Kennealy—who was divorced from her mother—and he held his hand on the outside of her clothes on her vagina as they cuddled. If she moved his hand away, he would put it back. He never attempted to give her gifts, and he never told her not to tell anyone.

¶27 One of Kennealy's nieces testified that, when she was seven or eight years old, Kennealy lived on her family's property. She testified that he told her that if she could cheat at cards, he could touch her. Sometimes he fondled her over her clothes and other times he pulled her shorts aside and rubbed her vagina. He told her not to tell her mom. This occurred 8 to 12 times and only when they were alone. Kennealy never tried to give his niece more gifts than an uncle normally would.

¶28 Another niece testified that Kennealy touched her four times: First, when she was 11 or 12 years old, Kennealy rubbed his hand on her crotch over her clothing while she watched television at her house. Her sister may have been in the room. Second, when this niece was 12 or 13, he rubbed her legs and breasts while she watched television. Her sister was in the room but she did not learn about the molestation until later. Third, after she went to bed that same night, she woke up four or five times because Kennealy was rubbing her breasts and kissing her face. Finally, Kennealy touched her crotch while they were sitting at the dining table with other people in the room. Kennealy told her once that it was "not okay" for her to tell anyone. RP (Mar. 10, 2008) at 353.

¶29 A third niece testified that, when she was 8 years old, Kennealy reached over and rubbed her crotch over her clothing when they were in the car together. He told her not to tell her mother. When she was about 11, Kennealy brought up the incident and asked her if she wanted him to do it again; she said no. He never offered her gifts.

IV. Common Scheme or Plan Closing Argument

¶30 During closing argument, the prosecutor made the following statements: "[t]he defendant has molested children most of his life. . . . He had a goal, a plan, a scheme to molest children. . . ." RP (Mar. 11, 2008) at 457. "This man . . . planned and carried out molestation for years, and years. . . ." RP (Mar. 11, 2008) at 461-62. The prosecutor said that you can tell by his prior conduct that his touching had the purpose of sexual gratification and that he has a "history of planning and carrying out assaults on children." RP (Mar. 11, 2008) at 465, 478. The prosecutor argued that Kennealy continued the same plan for "years and years and years"; that he had spent a lifetime planning sexual assaults; and that the incidents here were part of an "overreaching plan that this defendant has had his whole life or for years and years and years at least, and that's to isolate children and molest them." RP (Mar. 11, 2008) at 472, 478, 483, 502, 514. Defense counsel did not object to these statements.

¶31 The jury convicted Kennealy on all counts, and he timely appealed.

## ANALYSIS

I. S.J.'s Competency

¶32 Kennealy first maintains that the trial court should not have found S.J. competent to testify. Because the record supports the trial court's findings and conclusions that S.J. was competent, we disagree.

¶33 A witness must be competent to testify. RCW 5.60.020. A child witness is competent to testify if he or she (1) understands the obligation to speak the truth on the witness stand, (2) has the mental capacity at the time of the occurrence to receive an accurate impression of it, (3) has a memory sufficient to retain an independent recollection of the occurrence, (4) has the capacity to express in words his or her memory of the occurrence, and (5) has the capacity to

understand simple questions about the occurrence. *State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967).

¶34 On the other hand, a person is not competent to testify if he or she is "incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly." RCW 5.60.050(2). For example, a child who is unable to determine when during two years an incident occurred might be found incompetent. *In re Dependency of A.E.P.*, 135 Wn.2d 208, 224-26, 956 P.2d 297 (1998). Likewise, a child who has a "long-standing, often-observed inability to distinguish what was true from what was not" may also be found incompetent to testify. *State v. Karpenski*, 94 Wn. App. 80, 106, 971 P.2d 553 (1999), *overruled on other grounds by State v. C.J.*, 148 Wn.2d 672, 63 P.3d 765 (2003). But inconsistencies in a child's testimony go to weight and credibility, not to competency. *State v. Carlson*, 61 Wn. App. 865, 874, 812 P.2d 536 (1991).

¶35 Because the trial court is in the best position to observe a potential witness, competency determinations are within the trial court's sound discretion, and we review a trial court's competency determination for a manifest abuse of discretion. *Allen*, 70 Wn.2d at 692. We place particular reliance on the trial court's judgment in assessing a child witness's competency. *See State v. Borland*, 57 Wn. App. 7, 10-11, 786 P.2d 810 (1990) (child found competent even though child had difficulty responding to some questions and made some inconsistent statements because "[t]here is probably no area of law where it is more necessary to place great reliance on the trial court's judgment than in assessing the competency of a child witness"), *overruled on other grounds by State v. Rohrich*, 132 Wn.2d 472, 939 P.2d 697 (1997).

¶36 The record reflects that S.J. has ADHD and that he was confused about some of the specific details about the incident, such as the exact day and time of day it occurred, the shape of Kennealy's bed, and the types of floors and doors in Kennealy's apartment. S.J. also said once that he knew Kennealy had popsicles and knew that Kennealy

sucked his privates because he had dreamed it. And S.J. testified on one occasion that he made up the story that he took a bath at Kennealy's.

¶37 But S.J. demonstrated that he had an adequate memory of what Kennealy did to him and the mental capacity to relay the information in court: he never changed his story about Kennealy sucking "his privates." RP (Mar. 5, 2008) at 87. S.J. was also able to accurately testify about his age, his home environment, and his birthday. And while he and an officer were in the officer's car, S.J. recognized that they were driving into Yelm and he spelled the word "Yelm" for the officer. RP (Mar 10, 2008) at 376-77. Furthermore, the trial court specifically noted that S.J. listened carefully to questions while testifying at the competency hearing and that he tried to provide accurate answers. Finally, S.J. testified that he knew the difference between a truth and a lie and he was able to accurately respond to an example of a truth and a lie. S.J. also knew that he would get in trouble if he told a lie. We hold that the trial court did not abuse its discretion in finding that the *Allen* factors were met and that S.J. was competent to testify.

## II. CHILD HEARSAY STATEMENTS

¶38 Kennealy next contends that the trial court erred in admitting multiple child hearsay statements. Again, we disagree.

■ ■ ¶39 We review a trial court's decision to admit child hearsay statements for an abuse of discretion. *State v. Woods*, 154 Wn.2d 613, 623, 114 P.3d 1174 (2005) (quoting *State v. Jackson*, 42 Wn. App. 393, 396, 711 P.2d 1086 (1985)). A trial court abuses its discretion when its evidentiary ruling is manifestly unreasonable or is based on untenable grounds or reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). We may uphold a trial court's evidentiary ruling on the grounds the trial court used or on other proper grounds that the record supports. *State v. Powell*, 126 Wn.2d 244, 259, 893 P.2d 615 (1995).

■ ¶40 Child hearsay statements are admissible in a criminal or dependency case when the statements describe sexual or physical abuse of the child and (1) the court finds, in a hearing conducted outside the jury's presence, that the time, content, and circumstances of the statements provide sufficient indicia of reliability and (2) the child either (a) testifies at the proceedings or (b) is unavailable as a witness: provided, that when the child is unavailable as a witness, the statement may be admitted only if there is corroborative evidence of the act. RCW 9A.44.120(1); *A.E.P.*, 135 Wn.2d at 226 (quoting RCW 9A.44.120).

■ ¶41 In determining the reliability of child hearsay statements, the trial court considers nine factors: (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statement, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination,[6] (8) the remoteness of the possibility of the declarant's recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement. *Ryan*, 103 Wn.2d at 175-76 (citing *Dutton v. Evans*, 400 U.S. 74, 88-89, 91 S. Ct. 210, 27 L. Ed. 2d 213 (1970) and quoting *State v. Parris*, 98 Wn.2d 140, 146, 654 P.2d 77 (1982)).

■ ¶42 Kennealy contends that the trial court should not have admitted the child hearsay statements because the trial court did not specifically mention each *Ryan* factor in ruling that the children's hearsay statements were admissible. But the trial court expressly stated that the *Ryan* factors were met, and the factors exist to merely help the trial court determine "whether the comments and circumstances surrounding the statement indicate" reli-

---

[6] Factor (7) does not apply because S.J. testified.

ability. *State v. Swan*, 114 Wn.2d 613, 648, 790 P.2d 610 (1990).

¶43 No single *Ryan* factor is decisive and the reliability assessment is based on an overall evaluation of the factors. *State v. Young*, 62 Wn. App. 895, 902-03, 802 P.2d 829, 817 P.2d 412 (1991). But the factors must be "substantially met before a statement is demonstrated to be reliable." *State v. Griffith*, 45 Wn. App. 728, 738-39, 727 P.2d 247 (1986); *see also State v. Stevens*, 58 Wn. App. 478, 487, 794 P.2d 38 (1990) (appellate court may affirm admissibility of statements when trial court misapplied *Ryan* factors if reliability is apparent from the record). The record before us shows that the *Ryan* factors were substantially met; thus, the trial court did not abuse its discretion.

A. Motive To Lie

¶44 Kennealy contends that S.J. had a motive to lie to his sister because S.J. was in "time out" when he made the statement. Br. of Appellant at 42. But we agree with the trial court and are not persuaded that being in a "time out" for behavior unrelated to the incident makes it more likely that S.J. would fabricate his statements about Kennealy's action. RP (Feb. 19, 2008) at 81. Even if this circumstance were to indicate a motive to lie, it is only one of many factors considered in determining the reliability of S.J.'s statements. Kennealy does not contend that K.W. or M.Y. had a motive to lie, and there is no evidence in the record to support such a contention.

B. General Character

¶45 When assessing a child's general character, we look to whether the child has a reputation for truthfulness. *Swan*, 114 Wn.2d at 648. Here, the trial court found that each child was trustworthy, i.e., they each had a reputation for truthfulness, and each child testified that he or she knew the difference between a truth and a lie and understood that something bad would happen if he or she told a lie.

¶46 Kennealy contends that S.J.'s general character does not show reliability because he has ADHD and his mother said he was emotionally immature and had difficulty describing sequences. But ADHD, emotional immaturity, or difficulty in describing sequences of an event are not determinative of S.J.'s general character or truthfulness. And although S.J. testified that he "made up" the immaterial statement about taking a bath at Kennealy's house and that he dreamed about Kennealy molesting him, the trial court ascertained other indicia of S.J.'s general character for truth-telling that overcame the deficiencies on which Kennealy relies.

¶47 Kennealy also challenges M.Y.'s general character, arguing that her mother's statement that M.Y. can be "conniving" means that she cannot be trusted. M.Y.'s mother admitted that "every kid every now and then tells a little fib," but she said that if a person talks to M.Y. in the right way, she will tell the truth. RP (Feb. 4, 2008) at 159. M.Y. testified that she understood the difference between a truth and a lie, and the trial court found her trustworthy. M.Y.'s mother's statement—which she immediately corrected by saying that she meant M.Y. is smart and thinks outside the box—does not show that M.Y. is generally untrustworthy.

¶48 Kennealy does not challenge K.W.'s general character.

C. Past Fact

¶49 Almost all child hearsay statements about sexual abuse will contain statements about past facts. *Swan*, 114 Wn.2d at 650-51. In *State v. Leavitt*, 111 Wn.2d 66, 75, 758 P.2d 982 (1988), our Supreme Court held that this factor does not weigh either in favor of reliability or against reliability in the child abuse context. Here, all of the child hearsay statements involve statements of past fact. But because this factor is of little use in the child sexual abuse hearsay context, we hold that it does not render the statements unreliable. *See Swan*, 114 Wn.2d at 651.

## D. More than One Person

¶50 Kennealy next argues that the children's hearsay statements are unreliable because only one person heard each child's initial statement. But here, each child told the same accusations about Kennealy to more than one person over time. And when more than one person hears a similar story of abuse from a child, the hearsay statement is more reliable. *See Swan*, 114 Wn.2d at 651. Each child told a substantially similar account of the events to multiple people sequentially, which supports the trial court's ruling on the statements' reliability and trustworthiness.

## E. Spontaneity

¶51 Kennealy further contends that the children's statements were not spontaneous and were, therefore, unreliable because each child made his or her statement in response to questioning. But statements made in response to questioning are spontaneous so long as the questions are not leading or suggestive. *Carlson*, 61 Wn. App. at 872. Here, the witnesses who questioned the children did not use leading questions. In one instance, M.Y.'s father asked M.Y., "Does [Kennealy] make you feel uncomfortable?" and "[did] he touch you?" RP (Feb. 4, 2008) at 176-77. But the *Ryan* spontaneity requirement is broad, and we hold that the trial court did not abuse its discretion in finding the children's statements were spontaneous because these questions were open-ended and did not suggest that the child respond with a statement about sexual contact. *See State v. Henderson*, 48 Wn. App. 543, 550, 740 P.2d 329 (1987) (applying a "less narrow definition of 'spontaneous' " and finding a spontaneous response when a detective asked a child why it hurt when her father touched her vagina and she responded that he put his fingers in her vagina); *see also State v. Madison*, 53 Wn. App. 754, 756, 759, 770 P.2d 662 (1989) (statement spontaneous even though mother was reading a book about reproduction to the child). The

trial court did not abuse its discretion in finding that the children's statements were spontaneous because there is no evidence of leading or suggestive questioning.

### F. Timing of Declaration and Relationship to Child

¶52 The trial court must also consider when the child's statement was made to a hearsay witness and what the witness's relationship is to the child. *Ryan*, 103 Wn.2d at 176. When the witness is in a position of trust with a child, this factor is likely to enhance the reliability of the child's statement. *See Swan*, 114 Wn.2d at 650. Here, the children made the statements to their family members, with whom they were in a relationship of trust. And although the police officers and nurses were strangers, the children likely trusted them because of their authoritative position in the community and because the discussion took place in a trusting or clinical atmosphere. *See State v. Chadderton*, 119 Wn.2d 390, 398, 832 P.2d 481 (1992) (noting that nursing aid is in an inherent position of trust). Thus, this factor also supports the trial court's finding of reliability of S.J.'s, K.W.'s, and M.Y.'s statements to the witnesses.

### G. Possibility of Faulty Recollection

¶53 Kennealy argues that S.J.'s and M.Y.'s inconsistent statements show that their memories were faulty. But when a child makes a statement soon after an event and then makes consistent statements to other people shortly thereafter, there is little possibility that the child's recollection was faulty. *Swan*, 114 Wn.2d at 651. Here, S.J.'s disclosure was within a day or so of the incident. And K.W. and M.Y. made their statements around the same time that the incident occurred.

¶54 Kennealy also asserts that K.W.'s memory may be faulty because she had been told that Kennealy was a "bad guy" before she made the statement. Br. of Appellant at 47; RP (Mar. 10, 2008) at 407. But " '[a] young child is unlikely to fabricate a graphic account of sexual activity because such activity is beyond the realm of [a child's]

experience.' " *State v. Frey*, 43 Wn. App. 605, 610, 718 P.2d 846 (1986) (quoting Comment, *Sexually Abused Infant Hearsay Exception: A Constitutional Analysis*, 8 J. Juv. Law 59, 67 (1984)). Kennealy's challenge to the reliability of the children's statements to others based on faulty memory fails.

## H. Surrounding Circumstances Showing Misrepresentation

¶55 Kennealy finally maintains that S.J. may have misrepresented Kennealy's involvement to his sister because of the circumstances surrounding the statement, i.e., that he overheard his sister say Kennealy was acting "weird" during a telephone call. Clerk's Papers at 66; Br. of Appellant at 44. But nothing in the sister's statement suggested sexual misconduct with children or with S.J. These circumstances do not suggest misrepresentation by S.J.

¶56 Kennealy also argues that M.Y.'s statements might show misrepresentation because M.Y. spoke to K.W. about K.W.'s experiences with Kennealy. But M.Y.'s statements about what happened to her differ significantly from what happened to K.W. The differences between M.Y.'s and K.W.'s statements do not show influence by K.W. on M.Y.'s statements. Kennealy's argument that the children's statements were unreliable because of circumstances causing the children to misrepresent Kennealy's involvement fails.

¶57 The trial court did not abuse its discretion in admitting the children's hearsay statements because the *Ryan* reliability factors are substantially met.

## III. PRIOR MISCONDUCT EVIDENCE

¶58 Kennealy further alleges that the trial court erred in admitting evidence of four uncharged prior incidents of sexual misconduct with other minor children, alleging that they do not show a common plan or scheme and that the prejudicial effect substantially outweighed any probative value. We disagree.

¶59 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). Such propensity evidence is not prohibited because it is irrelevant; rather, " 'it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge.' " *State v. Herzog*, 73 Wn. App. 34, 49, 867 P.2d 648 (1994) (quoting *Michelson v. United States*, 335 U.S. 469, 475-76, 69 S. Ct. 213, 93 L. Ed. 168 (1948)).

¶60 Evidence of other wrongs or acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b). The trial court must presume that evidence of prior bad acts are inadmissible and decide in favor of the accused when the case is close. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003); *State v. Wilson*, 144 Wn. App. 166, 177, 181 P.3d 887 (2008). Evidence of a common scheme or plan may be used to show whether the charged incidents actually occurred or whether the victim was fabricating or mistaken. *State v. Lough*, 125 Wn.2d 847, 862, 889 P.2d 487 (1995). Evidence used for the purpose of proving a common plan or scheme is admissible only (1) if the State can show the prior acts by a preponderance of the evidence, (2) the evidence is admitted for the purpose of showing a common plan or scheme, (3) the evidence is relevant to prove an element of the crime charged, and (4) the evidence is more probative than prejudicial. *DeVincentis*, 150 Wn.2d at 17 (quoting *Lough*, 125 Wn.2d at 852).

¶61 We review a trial court's interpretation of an evidentiary rule de novo. *DeVincentis*, 150 Wn.2d at 17. We review the trial court's decision to admit or exclude the

evidence for abuse of discretion. *DeVincentis*, 150 Wn.2d at 17.[7]

### A. Proof of Common Scheme or Plan

¶62 First, Kennealy contends that the State did not prove that the evidence shows a common scheme or plan. We disagree.

██ ██ ¶63 Evidence of a single plan that is used "repeatedly to commit separate, but very similar, crimes," is admissible to show a common scheme or plan if it contains common features and a substantial degree of similarity such that the acts can be " 'explained as caused by a general plan of which [the charged crime and the prior misconduct] are the individual manifestations.' " *DeVincentis*, 150 Wn.2d at 19-20 (internal quotation marks omitted) (quoting *Lough*, 125 Wn.2d at 856). In such a case, "the similarity is not merely coincidental, but indicates that the conduct was directed by design." *Lough*, 125 Wn.2d at 860. But substantial similarity between the acts does not require uniqueness, and courts generally admit evidence of prior sexual misconduct in child sexual abuse cases.

¶64 For example, in *DeVincentis*, the court found prior acts of child molestation substantially similar to the charged crime and thus admissible to show a common scheme or plan. 150 Wn.2d at 22-24. There, the defendant planned to get to know prepubescent girls, created a trusting relationship with them, secluded them from others, and desensitized them to nudity by wearing almost no clothing around them. *DeVincentis*, 150 Wn.2d at 13, 22.

---

[7] We recognize that in 2008 the legislature passed RCW 10.58.090(1), which states, "In a criminal action in which the defendant is accused of a sex offense, evidence of the defendant's commission of another sex offense or sex offenses is admissible, notwithstanding Evidence Rule 404(b), if the evidence is not inadmissible pursuant to Evidence Rule 403." The evidence may arise from a charged or uncharged sex offense. *See* H.B. Rep. on Substitute S.B. 6933, 60th Leg., Reg. Sess. (Wash. 2008). Because this exception to ER 404(b) went into effect June 12, 2008, after Kennealy's trial, and because the State does not argue that it applies here, we review the trial court's conduct for abuse of discretion while considering the law at the time the trial court made its decision. *See* Laws of 2008, ch. 90, § 2.

¶65 Division Three of our court also held that evidence of prior misconduct was admissible to show a plan or scheme to molest in *State v. Sexsmith*, 138 Wn. App. 497, 157 P.3d 901 (2007), *review denied*, 163 Wn.2d 1014 (2008). Division Three held that the defendant's conduct was by design because, each time he molested the children, he was in a position of authority over them as a father or caretaker, and he isolated them when he abused them. *Sexsmith*, 138 Wn. App. at 505. These similarities suggested a common plan to molest rather than coincidence. *Sexsmith*, 138 Wn. App. at 505.

¶66 Similarly, Division One upheld the trial court's admission of testimony from the defendant's psychologist, even though none of the prior victims was permitted to testify, in *State v. Krause*, 82 Wn. App. 688, 690-92, 919 P.2d 123 (1996). The psychologist testified about the defendant's confessions about multiple acts of sexual contact with minor boys. *Krause*, 82 Wn. App. at 691-92. The acts showed a common scheme or plan because the defendant was not " 'simply predisposed to molest children' "; he interjected himself into situations with adults with small children, gained the children's affections, and isolated them before molesting them. *Krause*, 82 Wn. App. at 694-95. The defendant's continued contact with the children until sexual contact occurred showed evidence of a design—not a disposition—to molest boys. *Krause*, 82 Wn. App. at 695.

¶67 Here, considering the similarity between the three testifying victims' allegations and the testimony of Kennealy's prior victims, we hold that, even though Kennealy's behavior in each case was not identical, the trial court did not abuse its discretion in finding that evidence of the prior acts demonstrated a design to molest young children and, thus, that this evidence was admissible as part of a common scheme or plan.

B. Similarity between Victims' Allegations and the Prior Acts

¶68 Kennealy argues that his four prior incidents of sexual misconduct are different from the current charges

because they each involved close relatives, the locations differed, and they did not involve gifts or enticements. Although there are differences in the prior acts and the incidents involving S.J.—i.e., the prior misconduct involved girls who Kennealy rubbed and fondled with his hands, while the allegation involving S.J. is that Kennealy raped him by performing oral sex on him—the four prior incidents of sexual misconduct are substantially similar to the alleged conduct with S.J., K.W., and M.Y., and show Kennealy's design or pattern to gain the trust of children between the ages of 5 and 12 to allow him access to the children in order to sexually molest them.

¶69 Kennealy (1) told both S.J. and some of the prior misconduct witnesses not to tell anyone about what had happened; (2) committed the acts in a place or in a way that went unnoticed by others—either because he was out of view of others or because he was alone with children; (3) committed the acts on children who were related to him or lived and played close to him; (4) committed the acts only after the children knew him and trusted him, either because of a family relation or because he gave them popsicles, cappuccinos, or other treats, and talked to them on the playground; (5) chose victims whose ages ranged from 5 to 12 years old; (6) touched the girls both under and outside of their clothing on their vaginas; and (7) committed sexual acts more than once with most of the girls. The trial court concluded that these similarities showed a design to molest children and stated that the prior misconduct testimony was "remarkably similar and seemed consistent with the conduct of the defendant as related by the witnesses in this case so far." RP (Mar. 10, 2008) at 305.

¶70 We agree that the common features here show a plan or design to gain access to children in order to repeatedly sexually abuse young children. Thus, we hold that the trial court did not abuse its discretion in admitting evidence of prior misconduct as evidence of a common plan or scheme.

## C. Prejudice and Probative Balance

¶71 Kennealy further contends that even if the evidence did show a common scheme or plan, the prejudice arising from evidence of the prior acts outweighs their probative value in proving the charges in this case. Because the measure is whether the evidence is unfairly prejudicial, we again disagree.

¶72 Evidence of a common scheme or plan is subject to a balancing required under ER 403. *Sexsmith*, 138 Wn. App. at 505. Under ER 403, relevant evidence may be excluded if the danger of unfair prejudice substantially outweighs its probative value. We review a trial court's balancing of probative value against prejudice for abuse of discretion. *Sexsmith*, 138 Wn. App. at 506.

¶73 Prior similar acts of sexual abuse are generally "very probative of a common scheme or plan," and the "need for such proof is unusually great in child sex abuse cases." *Krause*, 82 Wn. App. at 696. The evidence is strongly probative because of the secrecy surrounding child sex abuse, victim vulnerability, the frequent absence of physical evidence of sexual abuse, the public opprobrium connected to such an accusation, a victim's unwillingness to testify, and a lack of confidence in a jury's ability to determine a child witness's credibility. *See Krause*, 82 Wn. App. at 696; *see also Sexsmith*, 138 Wn. App. at 506 (courts generally find substantial probative value in prior sexual abuse evidence when the only other evidence in the charged case is the child's testimony).

¶74 Here, there was no violence involved, there was no resulting physical evidence of abuse, the children were young when they testified, and there were no witnesses to the acts. As in *Krause* and *Sexsmith*, we hold that the trial court did not abuse its discretion in admitting the evidence to prove a common scheme or plan because the danger of unfair prejudice does not substantially outweigh the probative value of the four witnesses' testimony of prior acts of child sexual abuse.

## D. Limiting Instruction

¶75 Kennealy also contends that the trial court's limiting instruction was inadequate. The trial court instructed the jury before each prior misconduct witness testified that the jury could not use the testimony to judge Kennealy's character or propensity to commit such acts, but that it could consider the testimony only in determining whether it showed that Kennealy had a common scheme or plan. And at the trial's conclusion, the court also gave a written jury instruction stating that the evidence of uncharged allegations could not be used to prove character but could be considered only to determine a common scheme or plan.

¶76 Kennealy did not object to this instruction as given to the jury and, thus, he waived any challenge to its adequacy unless the instruction was a manifest error affecting a constitutional right. RAP 2.5. Kennealy does not argue that this instruction constituted a manifest error affecting a constitutional right. *See State v. Scott*, 110 Wn.2d 682, 686-87, 757 P.2d 492 (1988). Even if he had raised this issue, the record does not support the argument because the trial court instructed the jury that the evidence could not be used as propensity evidence.

## IV. COMMON SCHEME OR PLAN CLOSING ARGUMENT

¶77 Finally, Kennealy alleges that the prosecutor committed misconduct by repeatedly referring to the prior misconduct evidence during closing argument. To prove prosecutorial misconduct, the defendant must show that the prosecuting attorney's conduct was both improper and prejudicial. *State v. Gregory*, 158 Wn.2d 759, 858, 147 P.3d 1201 (2006). If a defendant fails to object to the alleged prosecutorial misconduct at trial, he or she waives the argument unless the conduct is " 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' " incurable by a curative jury instruction following an objection. *Gregory*, 158 Wn.2d at 841 (quoting *State*

*v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). A prosecutor has "wide latitude" in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence in closing arguments. *Gregory*, 158 Wn.2d at 860.

¶78 Here, when the prosecutor mentioned the prior misconduct evidence during closing argument, she did so in the context of saying that Kennealy had a plan or scheme to molest children. This was the limited purpose of admitting the evidence, and the prosecutor has wide latitude to make arguments the evidence supports. *Gregory*, 158 Wn.2d at 860. Furthermore, we presume the jury follows the court's instruction to consider the evidence only to show a common scheme or plan. *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982). Consequently, we hold that the prosecutor did not act improperly and Kennealy's claim of prosecutorial misconduct fails.

¶79 We affirm Kennealy's convictions.

HOUGHTON and PENOYAR, JJ., concur.

Review denied at 168 Wn.2d 1012 (2010).