**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 79269-5-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| JUAN GARCÍA GONZÁLEZ, | |
| Appellant. | |

CHUN, J. — Juan García González appeals his jury conviction for three counts of child molestation. He claims the trial court erred by (1) admitting evidence of his prior sexual abuse of a different child in the same household to prove a common scheme or plan and (2) permitting the prosecutor to cross-examine the defense expert witness regarding facts she did not rely on in forming her opinion. He also claims that cumulative error warrants a new trial. We affirm.

## I. BACKGROUND

García González lived in a two-story house in Kent with his wife Theresa, his stepson Chris Carpenter, his two daughters, and his seven grandchildren. In November 2014, seven-year-old A.V. and her mother moved into the house. At that time, A.V. was the only child in the house that was not García González's biological grandchild. But A.V. referred to García González as "grandpa" and

treated his grandchildren as her cousins. García González invited A.V. with him on errands and often bought her clothing, gifts, and candy or fast food.

In the spring of 2016, García González stopped sleeping with his wife in the master bedroom and started sleeping on a couch in the living room. He invited the children to have "sleep-overs" with him in the living room where they would watch television. On at least two occasions, A.V. and García González were the only ones in the room and spent the night on the same couch together. García González's stepson Chris Carpenter saw him and A.V. "cuddling" and "spooning" on the couch while under a blanket.

Around that time, A.V. began exhibiting behavioral changes such as difficulty sleeping and refusing to bathe or change her clothes. In late 2016, A.V. told an adult family friend that she was "being touched." At Mary Bridge Children's Hospital in Tacoma, A.V. told Dr. Yolanda Duralde, the medical director of the Child Abuse Intervention Department, that "grandpa" had touched her more than once. A.V. stated that the most recent incident occurred two nights prior while she was in the living room watching television with García González. She said he pulled down his shorts and her underwear and then rubbed "his private on my private and was moving around." García González told A.V. that he would spank her if she told anyone.

About two weeks later, A.V. told child interview specialist Alyssa Layne that during the most recent occurrence, García González got on top of her, pulled down both of their pants, and "put his boy part, trying to hurt me in my girl part."

2

Next, he put "his boy part up my back, my back body part," spit on his fingers, and wiped his saliva on her "back body part" before he "put it in." He also pushed her onto her "tummy," spit on his fingers, and wiped them on her "girl part." A.V. further disclosed that García González had done "inappropriate stuff" to her on other occasions. She said he licked her "down there" when they were on the living room couch under a blanket while other people were sleeping in the same room.

A.V.'s genital exam was normal. A forensic analysis of evidence collected during the sexual assault exam revealed the presence of a major DNA profile matching García González on the crotch area of A.V.'s underwear. There was also a trace amount of DNA from two other individuals. In the same area of A.V.'s underwear, the forensic tests detected a very small number of sperm cells, acid phosphate, and amylase. Acid phosphate is an enzyme found in elevated levels in semen, and amylase may indicate the presence of saliva. But the tests were not conclusive for the presence of these substances.

The State charged García González in an amended information with three counts of child molestation in the first degree. At trial, A.V. testified that García González touched her "private parts . . . a lot." The first time it happened, she was watching television with García González on the living room couch. He pulled down her underwear, put his hand on her "vagina," and moved his fingers around. A.V. testified that on other occasions, he "licked my private" in the living room while watching television or in the master bedroom. In another instance,

3

while A.V. was sleeping on the floor of the master bedroom, García González put "his boy part" in A.V.'s vagina and tried "to make it go inside." One time when they were alone in a downstairs bedroom, he pulled his pants down and told A.V. to "suck his private" while forcibly moving her head until her mouth touched his penis. On the night of the final incident, during a "sleep-over" in the living room after the other children went to sleep, García González pulled down A.V.'s pants and tried to "stick his private into mine again."

The State sought to introduce evidence of García González's prior sexual abuse of H.K., an eight-year-old girl who lived in García González's house in 2011, as part of a "common scheme or plan" under ER 404(b). H.K. moved into the house because her single mother suffered from substance abuse and could no longer care for her. H.K. called García González "grandpa." He took her on errands and bought her candy, food, clothing, and gifts.

H.K. testified that García González touched her "about five times." Some of the abuse took place in a bedroom where H.K. sometimes slept with García González's two-year-old granddaughter. García González laid in bed behind H.K. and "squeezed" her breasts and "vagina" while the granddaughter slept nearby. She felt something rubbing against the back of her leg, but she wasn't sure if it was his penis or his belt buckle. García González also licked and "[made] out with" H.K.'s ear. On other occasions, the abuse took place in the living room while they were watching television. He touched H.K.'s chest under a blanket while other people were in the room. In one incident, while hidden by a

4

blanket, García González pushed H.K.'s head down towards his "private parts." H.K. eventually disclosed the abuse because she wanted it to end.  In 2012, García González was charged with first degree child molestation of H.K. and later pleaded guilty to fourth degree assault – domestic violence.  He began abusing A.V. two years later.

Over García González's objection, the trial court granted in part and denied in part the State's ER 404(b) motion.  The court ruled that the State could present evidence of García González's abuse of H.K. through her live testimony, but nothing more, because "any other evidence would be cumulative and risk unfair prejudice to the defendant."[1]  The court concluded, in pertinent part:

> [T] he purpose of this evidence is to show that the defendant employed a common plan or scheme in touching both children.  The defendant used this plan repeatedly to perpetrate separate but very similar instances of abuse where he licked both girls' bodies, fondled their genitals as they slept, rubbed his penis against their bodies, and solicited oral intercourse.  The Court is not persuaded by the defense argument that the commonalities that existed between the touching of both children would exist in most cases of molestation and that the defendant's touching was merely opportunistic. . . . Those similarities include the fact that the children were almost identical ages, identical in their personal situation, not biologically related to the defendant and viewed him as their grandfather.  The defendant showed some favoritism and attempts to groom the children for abuse.  While all the children received some amount of grandfatherly spoiling, there was credible evidence that A.V. and H.K. were singled out for some privileges.  The Court gives considerable weight to the defendant's attempts to normalize gradually escalating physical touching by watching television with both girls, often beneath blankets, while their bodies were in physical contact.  It was in this living room, under the guise of watching television, that much of the abuse of both children

---

[1] The State also sought to introduce evidence of H.K.'s abuse through García González's 2012 conviction, H.K.'s child forensic interview, testimony of the child forensic interview specialist regarding the interview, a detective's interview of García González regarding H.K., and testimony from H.K.'s mother and Chris Carpenter.

occurred. The frequency of the touching is similar for both children, as was the licking of their bodies and the way in which the defendant solicited oral intercourse by placing his hands on the back of their heads and pushing them towards his genital area.

In determining that the "high probative value of this evidence outweighs the risk of unfair prejudice," the court noted that García González's defense was general denial, that the forensic evidence was "far from conclusive," and that "A.V.'s credibility will be central to the case and evidence of the defendant's common scheme or plan is highly probative of this evidence." Before H.K.'s testimony at trial and in the jury instructions, the court provided a limiting instruction stating that the evidence may be considered only to evaluate whether a common scheme or plan existed and not for any other purpose.

García González's expert witness, Dr. Elizabeth Johnson, opined that forensic testing did not establish that García González sexually assaulted A.V. She criticized the State's testing procedures and results. She also opined that García González's DNA could have been transferred to A.V.'s underwear in the laundry.

The trial court permitted García González to present "other suspect" evidence regarding Lucas Amansec, a registered sex offender who lived in the house during the same time period that A.V. was abused. A.V. testified that Amansec had never touched her inappropriately. Amansec was not living in the house when H.K. was abused.

García González testified at trial.  He denied molesting A.V.  Defense counsel argued that A.V. either fabricated the allegations for attention or that she was mistaken and that Amansec was the true perpetrator.

The jury convicted García González as charged.  He appeals.

## II. ANALYSIS

A. ER 404(b) Evidence of Prior Misconduct

Common Scheme or Plan

García González argues that the trial court erred by admitting H.K.'s testimony under ER 404(b) as part of a common scheme or plan.  We review its decision to admit evidence under ER 404(b) for an abuse of discretion.  State v. Foxhoven, 161 Wn.2d 168, 174, 163 P.3d 786 (2007).  "Discretion is abused if it is exercised on untenable grounds or for untenable reasons."  State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002).

> ER 404(b) provides:
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

"ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting a defendant is guilty because [they are] a criminal-type person who would be likely to commit the crime charged."  Foxhoven, 161 Wn.2d at 175 (quoting State v. Lough, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

"One proper purpose for admission of evidence of prior misconduct is to show the existence of a common scheme or plan." State v. Gresham, 173 Wn.2d 405, 421, 269 P.3d 207 (2012). A common scheme or plan "may be established by evidence that the Defendant committed markedly similar acts of misconduct against similar victims under similar circumstances." Lough, 125 Wn.2d at 852. Such evidence is admissible if the prior misconduct and the charged crime show "such occurrence of common features that the various acts are naturally to be explained as caused by a general plan of which the [two] are the individual manifestations." Lough, 125 Wn.2d at 860. In that event, the evidence is admissible "because it is not an effort to prove the character of the defendant" but "to show that the defendant has developed a plan and has again put that particular plan into action." Gresham, 173 Wn.2d at 422. "[S]ubstantial similarity between the acts does not require uniqueness, and courts generally admit evidence of prior sexual misconduct in child sexual abuse cases." State v. Kennealy, 151 Wn. App. 861, 887, 214 P.3d 200 (2009).

To admit such evidence, the court "must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect." Thang, 145 Wn.2d at 642.

Contrary to García González's assertions, the incidents involving A.V. and H.K. are sufficiently similar to support a conclusion that they were manifestations

8

of a common scheme or plan. Both girls were similar in age and were the only children in the house who were unrelated to García González. Both came to live in his home because they have single mothers who struggled with the demands of parenting. Both girls came to view García González as their grandfather, and he took them on outings and bought them gifts and treats. He touched both girls' genitals with his hand, rubbed his crotch against them, licked them, and pushed the back of their heads towards his crotch. And notably, García González normalized physical contact with both girls by watching television with them on the living room couch, often under a blanket while others were nearby. These common features are supported by the record and are sufficient to demonstrate a common scheme or plan under ER 404(b). See Kennealy, 151 Wn. App. at 885-88; Gresham, 173 Wn.2d at 421-23; State v. Kipp, 171 Wn. App. 14, 20-22, 286 P.3d 68 (2012), reversed on different grounds, 179 Wn.2d 718 (2014).

García González asserts that the court erred in finding that the girls' reason for living in the house and the "grandpa" relationship is part of a common scheme or plan because there is no evidence he lured the girls into the home or encouraged them to view him as a grandfather as part of a molestation plan. But the court did not find that García González orchestrated these events, nor was it required to. "[A]cts which in themselves or alone carry no . . . suggestion [of design or plan] may, when multiplied, or when compared with *other acts* or circumstances, suggest a common plan as the explanation[.]" State v. Burkins, 94 Wn. App. 677, 689, 973 P.2d 15 (1999) (alteration in original) (quoting 2 JOHN

9

H. WIGMORE, Evidence § 240, at 42 (1979)). These similarities, when considered in tandem with the others, support an inference of common scheme or plan.

García González next argues that the court erred in finding that he showed favoritism to A.V. and H.K. as part of a common scheme or plan. He points to evidence in the record showing that he treated A.V. and H.K. in a similar manner as he treated his grandchildren. But the court did not disregard this evidence. It found that "[t]he defendant gave both girls gifts and clothes and took them on trips, though there is conflicting testimony about to what extent the defendant's wife also participated and whether other grandkids received similar privileges." But ultimately, it concluded that "there was credible evidence that A.V. and H.K. were singled out for some privileges." And the trial court's credibility determinations are not reviewable on appeal. State v. Cross, 156 Wn. App. 568, 581, 234 P.3d 288 (2010).

Next, García González highlights dissimilarities between his abuse of H.K. and A.V. to challenge the court's finding that they were substantially similar enough to constitute a molestation plan. For example, he asserts that the court erred in finding that he solicited oral intercourse from both girls by placing his hand on the back of their heads because A.V. testified that he directly asked her to suck his penis whereas he did not speak to H.K. during the episode. On this basis, he contends that the trial court relied on an incorrect understanding of what "substantial similarity" means to reach its erroneous conclusions. García González is incorrect. A precise match between the prior acts and the charged

crime is not required to admit the evidence as part of a common scheme or plan. See Kennealy, 151 Wn. App. at 889 (evidence of defendant's prior sexual misconduct admissible as part of a common scheme or plan even though his behavior in each case was not identical); Kipp, 171 Wn. App. at 21 (no abuse of discretion where victims were of similar ages, both were the defendant's nieces, and both were sexually abused in the same locations but in different ways). García González touched both girls' genitals with his hands, rubbed his crotch against them, licked their bodies, and pushed their heads towards his crotch. These overarching similarities suffice to support the court's findings.

García González also argues that the location, initiation, and timing of the abuse of H.K. and A.V. were not significantly similar to support a finding of common scheme or plan. He contends that any commonalities show opportunity at best. We disagree. García González abused both girls on or near the living room couch while watching television, sometimes under a blanket and while others were present. He also abused both girls in bedrooms while other people were asleep in the same room. All of the abuse occurred in the evening. These similarities amply support a finding of sufficient similarity. And while García González asserts that the lapse of time between his abuse of H.K. and A.V. erodes any finding of similarity, this factor is not determinative. State v. Sexsmith, 138 Wn. App. 497, 505, 157 P.3d 901 (2007). The trial court did not abuse its discretion in admitting evidence of H.K.'s abuse as part of a common scheme or plan.

11

Absence of Mistake or Misidentification

After trial testimony began, the trial court permitted García González to present evidence that registered sex offender Lucas Amansec could have committed the sexual assaults A.V. described.[2]  The prosecutor then argued that the prior acts evidence previously admitted under ER 404(b) was also admissible to show absence of mistake and identification.  Thus, the court included the following language in its ruling:

> The Court notes that the defendant has also opted to pursue an "other suspect" defense claiming a registered sex offender living in the house, Lucas Amansec, may have been the true perpetrator and that A.V. misidentified her abuser.  In response to this, the State offered a second basis for admitting the defendant's misconduct against H.K., namely that it goes to A.V.'s absence of mistake in naming the defendant as the true perpetrator.

García González argues that admitting H.K.'s testimony to rebut a claim of A.V.'s mistaken identification of García González as the perpetrator was not a valid application of the "absence of mistake" purpose under ER 404(b).  On this basis, he contends that if the trial court based any aspect of its ER 404(b) ruling on absence of mistake, it was reversible error.  But the State's argument is more like the "identity" purpose than the "absence of mistake" purpose.  Such evidence is admissible under ER 404(b) to establish identity through a unique modus operandi.  Foxhoven, 161 Wn.2d at 175.  Moreover, as discussed above, the trial court properly admitted the prior acts evidence as part of a common scheme or plan.  And there is nothing in the court's findings and conclusions to indicate that

---

[2] The trial court admitted this evidence as a sanction against the State for its late disclosure of Amansec's status as a sex offender.  See Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

its decision to admit evidence of H.K.'s abuse was in any way dependent on the State's argument about A.V.'s identification of García González as her abuser. This argument does not provide a basis for reversal.

Probative Value

García González asserts that the court erred in concluding that the probative value of H.K.'s testimony outweighed its prejudicial effect. He contends that the court committed legal error by assigning high probative value to evidence of H.K.'s abuse not because of substantial similarities between H.K. and A.V.'s accounts, but because A.V.'s credibility was an issue in the case. He also contends that the highly prejudicial nature of this evidence deprived him of a fair trial. We disagree.

Under ER 403, relevant evidence may be excluded if the danger of unfair prejudice substantially outweighs its probative value. Prior similar acts of sexual abuse are "strongly probative because of the secrecy surrounding child sex abuse, victim vulnerability, the frequent absence of physical evidence of sexual abuse, the public opprobrium connected to such an accusation, a victim's unwillingness to testify, and a lack of confidence in a jury's ability to determine a child witness's credibility." Kennealy, 151 Wn.2d at 890. Trial courts should give particular consideration to the probative value of common scheme or plan evidence when corroborating evidence is unavailable. State v. DeVincentis, 150 Wn.2d 11, 25, 74 P.3d 119 (2003).

13

Here, the record shows that the court carefully considered the strongly prejudicial nature of the evidence and concluded that its high probative value outweighed the risk of prejudicial effect. In reaching this conclusion, the court noted that the forensic evidence was not conclusive and that the case turned largely on A.V.'s testimony. This was entirely appropriate. The court also minimized the risk of unfair prejudice by limiting the evidence to H.K.'s trial testimony and by giving a limiting instruction before her testimony and in the jury instructions. The court properly exercised its discretion in finding that the high probative value of the prior acts was not substantially outweighed by the danger of unfair prejudice.

B. ER 703

For the first time on appeal, García González contends that the prosecutor's cross-examination of Dr. Elizabeth Johnson violated ER 703 and ER 705, thereby prejudicially undermining her expert opinion on the DNA evidence. As a general rule, appellate courts will not consider an issue raised for the first time on appeal unless it is a manifest error affecting a constitutional right. RAP 2.5(a)(3); State v. Fraser, 170 Wn. App. 13, 27, 282 P.3d 152 (2012). "We adopt a strict approach because trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial." State v. Powell, 166 Wn.2d 73, 83, 206 P.3d 321 (2009) (citing State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). For this reason, we "will not reverse the trial court's decision to admit evidence where the trial court rejected the specific

ground upon which the defendant objected to the evidence and then, on appeal, the defendant argues for reversal based on an evidentiary rule not raised at trial." Powell, 166 Wn.2d at 82.

Here, García González objected to the prosecutor's cross-examination of Dr. Johnson once based on relevance. That objection was overruled. Another objection based on the formulation of a question was sustained. Neither objection could have alerted the trial court to the claimed evidentiary error he now raises on appeal. Thus, García González failed to preserve it.

C. Ineffective Assistance of Counsel

García González asserts that his trial counsel's failure to object under ER 703 and ER 705 constituted ineffective assistance of counsel. To show ineffective assistance of counsel, the defendant must show that counsel's representation was deficient and that the deficient representation caused prejudice. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). To establish deficient performance, the defendant must show that counsel's performance fell below an objective standard of reasonableness. McFarland, 127 Wn.2d at 335. Prejudice is shown only if there is a reasonable probability that the result of the proceeding would have been different absent counsel's unprofessional errors. In re Pers. Restraint of Davis, 152 Wn.2d 647, 672-73, 101 P.3d 1 (2004).

ER 703 allows an expert to base an opinion on inadmissible facts or data as long as the evidence is "of a type reasonably relied upon by experts in the

15

particular field in forming opinions or inferences upon the subject." ER 705 provides that an "expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data." But the expert may be required to disclose the underlying facts or data on which that opinion is based during cross-examination. ER 705. Although ER 703 and ER 705 "permit the disclosure of otherwise hearsay evidence to illustrate the basis of the expert witnesses' opinion, they do not permit the unrelied upon opinions and conclusions of others to be introduced in cross-examination for impeachment purposes." Washington Irr. and Dev. Co. v. Sherman, 106 Wn.2d 685, 688, 724 P.2d 997 (1986) (emphasis omitted) (quoting Ferguson v. Cessna Aircraft Co., 132 Ariz. 47, 49, 643 P.2d 1017 (Ariz. Ct. App. 1981)). In addition, "[t]he law allows cross examination of a witness into matters that will affect credibility by showing bias, ill will, interest, or corruption." State v. Russell, 125 Wn.2d 24, 92, 882 P.2d 747 (1994).

García González asserts that the prosecutor improperly cross-examined Dr. Johnson regarding records created by others that she did not rely on in reaching her conclusions. He asserts that the repeated error undermined Dr. Johnson's credibility and prejudicially affected the outcome of the trial. But Dr. Johnson stated that she reviewed A.V.'s medical records and forensic child interview in preparing her report. The record shows that the prosecutor questioned Dr. Johnson regarding facts, not opinions, on which her opinion was based. This was not improper. Trial counsel was thus not ineffective for failing

16

to object on this basis.  See State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011) (defense counsel not ineffective for failing to object to argument that was not improper or prejudicial).

D.  Cumulative Error

García González argues that cumulative error denied him a fair trial.  "The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal."  In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012).  Because García González's claims lack merit, no error occurred.

We affirm.

Chun, J.

WE CONCUR:

Leach, J.

17