# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71467-8-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| EMYLL S. MATOS-RAMOS, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: February 21, 2017 |
| | ) | |

Cox, J. — Emyll Matos-Ramos appeals his judgment and sentence based on his conviction of second degree assault of a child, A.S. The trial court did not abuse its discretion in admitting evidence of Matos-Ramos's prior acts to rebut the claim of accident for this charged crime. The child's hearsay statements were properly admitted, and the child was competent to testify. Matos-Ramos's challenge to the trial court's failure to give a jury instruction that he did not request is not properly before us. But he correctly argues that the inclusion of a domestic violence finding in the judgment, which the jury had not found, was incorrect. We affirm Matos-Ramos's conviction, vacate the domestic violence finding, and remand for correction of the judgment and sentence. We also deny any request for an award of appellate costs to the State.

A.S. and his mother lived with Matos-Ramos for approximately two years. Matos-Ramos often supervised A.S. while the mother worked. Matos-Ramos describes his relationship with A.S. as having "its ups and downs."[1]

A.S., then four, sustained a fractured femur in July 2010 while at home alone with Matos-Ramos. After Matos-Ramos called 911, first responders arrived at the scene. There was conflicting evidence on what happened.

A.S. first told police and firefighters, who responded to the 911 call, that he had run into a table. He then told Officer Stacy Eckert that Matos-Ramos had kicked him for not reading properly. A.S. said that he was not supposed to tell what really happened and was supposed to say he ran into a table. On the way to the hospital, A.S. asked the ambulance driver if the true cause of his injury could remain secret. At trial, A.S., then seven, testified that Matos-Ramos had kicked him during the July 2010 incident.

Matos-Ramos claimed to have been playing video games when he heard a noise behind him during this incident. He allegedly turned to see A.S. on the floor, near a table. Matos-Ramos then called 911.

A.S. spoke to others as well after the incident, including treatment providers at the hospital and a forensic child interview specialist. Following investigation, police arrested Matos-Ramos.

The State charged him with one count of second degree assault of A.S. The information also alleged domestic violence.

---

[1] Amended Brief of Appellant at 6.

Before trial, the State sought to admit evidence of two prior incidents under ER 404(b). In both, A.S. had sustained bruising while in Matos-Ramos's care. Over Matos-Ramos's objection, the court admitted the evidence for both incidents.

Matos-Ramos also challenged A.S.'s hearsay statements to several witnesses. The trial court admitted these statements.

Matos-Ramos sought a hearing on A.S.'s competency. After reviewing evidence and arguments, the court denied Matos-Ramos's motion and permitted A.S. to testify at trial. After A.S. and his mother testified at trial, Matos-Ramos again challenged A.S.'s competency. The trial court again rejected this claim.

A jury found Matos-Ramos guilty of second degree assault. The verdict did not include any finding on the domestic violence allegation in the information. The trial court entered its judgment and sentence on the jury verdict but also included a finding that domestic violence "was [pleaded] and proved."

Matos-Ramos appeals.

## ABSENCE OF ACCIDENT

Matos-Ramos argues that the trial court abused its discretion by admitting evidence of his two prior acts under ER 404(b). We hold that admission of this evidence was proper under the "absence of . . . accident" exception of this rule.[2]

Under ER 404(b), trial courts may not admit certain evidence. This rule states:

---

[2] ER 404(b).

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or **absence of** mistake or **accident**.[3]

We review for abuse of discretion a trial court's decision to admit evidence.[4]

### Other Acts

Matos-Ramos argues that the trial court abused its discretion by admitting evidence of two other acts that the State offered to show a lack of accident. Specifically, he claims the "lack of accident" exception is only relevant when a defendant "**admits** he engaged in the criminal act [charged] but claims he did so accidentally." That is not the law.

First, there is no support for this argument in the plain language of ER 404(b). Nowhere does this rule state a requirement to show either that the accused **admits** engaging in the charged crime or that the accused claims he did so **accidentally**. There is no reason to imply such requirements where the rule does not expressly state them.

Second, in State v. Norlin, the supreme court held that evidence of prior injuries is admissible under this rule in child abuse cases.[5] But it is admissible

---

[3] (Emphasis added.)

[4] State v. Quaale, 182 Wn.2d 191, 196, 340 P.3d 213 (2014).

[5] 134 Wn.2d 570, 572, 951 P.2d 1131 (1998).

4

only if the State shows by a preponderance of the evidence a connection between the accused and the child's prior injuries.[6]

Here, it is undisputed that Matos-Ramos is connected to A.S.'s prior injuries. The unchallenged findings in the trial court's ER 404(b) ruling, which are verities on appeal, state:

> 2. The State has proved by a preponderance of the evidence that A.S. had bruising to his chin and forehead on July 27, 2010 and that this was caused by the defendant holding or pinning him down.
>
> 3. The State has proved by a preponderance of the evidence that A.S. had bruising to his lower back in approximately March of 2010 and that this was caused by the defendant hitting him with a slipper or flip-flop.[7]

Third, Norlin does not impose the additional requirement to admissibility argued here by Matos-Ramos. More importantly, no other case authority supports the bar to admission of other acts evidence that he argues in this case.

State v. Roth[8] is instructive. Randolph Roth's wife drowned while the two were on an outing at Lake Sammamish.[9] He was the beneficiary of a large insurance policy on her life at the time.[10]

---

[6] Id.

[7] Clerk's Papers at 89; In re Estate of Barnes, 185 Wn.2d 1, 9, 367 P.3d 580 (2016).

[8] 75 Wn. App. 808, 881 P.2d 268 (1994).

[9] Id. at 810.

[10] Id.

The charges against him included first degree murder, first degree theft, and second degree theft.[11] He pleaded not guilty to all charges.[12]

At trial, the State sought to admit evidence regarding the earlier death of Roth's prior wife who had died from a 300-foot fall.[13] This occurred under suspicious circumstances while he was on an outing with her. He was also the beneficiary of a large insurance policy on her life.[14]

Over Roth's objection, the trial court admitted the evidence regarding Roth's prior wife's death.[15] The court concluded Roth's position at trial was that his current wife's death was an accident.[16] Thus, admission of this evidence was relevant to rebut that claim.[17]

On appeal, we affirmed.[18] We did so because "the events surrounding [the prior wife's] death were admissible under ER 404(b) to prove absence of accident" in the current wife's death.[19]

---

[11] Id. at 811.

[12] Id. at 812.

[13] Id. at 812.

[14] Id. at 812-14.

[15] Id. at 814-15.

[16] Id.

[17] Id.

[18] Id. at 810.

[19] Id. at 818.

In reaching this conclusion, we cited two cases: State v. Fernandez[20] and State v. Gogolin.[21] We observed that in each of these precedents, a material issue of accident arose where the defendant denied committing the current crime and asserted "happenstance or misfortune" as the cause of the victims' injuries.[22]

In all these cases, the accused claimed accident in defense to the charged crime. In no case did the accused claim that he engaged in the charged conduct, accidentally or otherwise. To the contrary, in Roth, the defendant denied any involvement in the charged crime.[23] Nevertheless, the admission of the other acts evidence was proper to rebut the claim of accident for the charged crime.

The same is true in this case. Matos-Ramos expressly asserted "to the initial police and fire personnel that A.S. had hurt himself by accident."[24] Moreover, his connections to the prior other acts are undisputed. The trial court properly exercised discretion in admitting evidence of Matos-Ramos's other acts.

Matos-Ramos relies on State v. Bowen[25] and State v. Hernandez[26] to support his novel argument. Neither case provides such support.

---

[20] 28 Wn. App. 944, 628 P.2d 818 (1980).

[21] 45 Wn. App. 640, 727 P.2d 683 (1986).

[22] Roth, 75 Wn. App. at 819.

[23] Id. at 811.

[24] Clerk's Papers at 89.

[25] 48 Wn. App. 187, 738 P.2d 316 (1987), abrogated in part on other grounds by State v. Lough, 125 Wn.2d 847, 889 P.2d 487 (1995).

[26] 99 Wn. App. 312, 997 P.2d 923 (1999).

In Bowen, James Bowen, a physician appealed his indecent liberties conviction, arguing that the trial court abused its discretion by admitting evidence of two prior incidents in which he touched different female patients' breasts.[27] His defense at trial was general denial.[28] Specifically, he denied touching the current victim's private parts, even accidentally.[29] The trial court held that the prior acts evidence was inadmissible because there was no assertion of accident by the physician.[30]

Notably, the defendant in that case had not admitted to the charged conduct. So that case does not support the theory Matos-Ramos now argues. And there is absolutely no wording in the opinion to support his novel theory in this appeal.

At oral argument, Matos-Ramos's counsel also relied on Hernandez to support the argument. We see nothing in that case that holds there is any requirement for the admission of other acts evidence that the accused admits the charged conduct but claims it was done accidentally.

In sum, there is no basis, either in the text of ER 404(b) or the case law, to support the argument that Matos-Ramos makes. We reject it.

---

[27] Bowen, 48 Wn. App. at 188-89.

[28] Id. at 193.

[29] Id.

[30] Id. at 193-94.

*Intent*

We note that the trial court also admitted evidence of Matos-Ramos's other acts as evidence of his intent. This was also proper.

Under ER 404(b), the trial court may admit evidence of a person's other crimes, wrongs, or acts to show intent. But this evidence must be relevant to a material issue before the jury.[31] Specifically, "prior misconduct evidence is only necessary to prove intent when intent is at issue or when proof of the doing of the charged act does not itself conclusively establish intent."[32]

State v. Daniels[33] is analogous to this case. There, Audie Daniels cared for a toddler, S, while S's mother worked.[34] The State charged Daniels with two counts of second degree assault arising from incidents in June 1994 and January 1995 resulting in S's injuries.[35] Daniels claimed that S sustained injuries during the first incident by falling.[36] He also claimed that S sustained injuries during the second incident by jumping from a couch.[37]

---

[31] State v. Olsen, 175 Wn. App. 269, 280, 309 P.3d 518 (2013), aff'd, 180 Wn.2d 468, 325 P.3d 187 (2014).

[32] State v. Powell, 126 Wn.2d 244, 262, 893 P.2d 615 (1995).

[33] 87 Wn. App. 149, 940 P.2d 690 (1997).

[34] Id. at 151.

[35] Id.

[36] Id.

[37] Id.

A jury convicted Daniels and he appealed, arguing that the trial court abused its discretion by admitting evidence of Daniels's other abuse of S.[38] The trial court admitted testimony from S's mother regarding S's bruises that appeared after Daniels cared for S in October 1994.[39] Daniels explained to S's mother that he spanked S while going up stairs and that S hit her head on each step.[40] S's bruising from this incident was similar to her bruising in June.[41]

The State had to prove that Daniels recklessly inflicted substantial bodily harm to S.[42] This court stated that "the similarity" in S's bruising made "the evidence relevant to show intent and recklessness."[43] This court concluded that the trial court did not abuse its discretion in admitting the evidence because it "show[ed] Daniels'[s] knowledge of the risk of the harm."[44] Additionally, the evidence "was relevant to prove his later conduct was reckless, since it tended to show he should have learned that such extreme discipline of a young child can cause injury."[45] As to intent, this court concluded that "the challenged evidence

---

[38] Id. at 151, 157.

[39] Id. at 157.

[40] Id.

[41] Id.

[42] Id.

[43] Id. at 158.

[44] Id.

[45] Id.

show[ed] that Daniels intentionally disciplined the child excessively, with repeated physical strikes."[46]

Here, the State alleged that Matos-Ramos kicked A.S., ultimately causing his fractured femur. The State had to prove that Matos-Ramos "intentionally assault[ed]" A.S. "and thereby recklessly inflict[ed] substantial bodily harm." The State sought to admit the evidence of A.S.'s prior bruises to prove Matos-Ramos's intent and recklessness.

Matos-Ramos's intent was thus at issue because "proof of the doing of the charged act does not itself conclusively establish intent."[47] Specifically, the fact that Matos-Ramos allegedly kicked A.S. does not, in itself, conclusively establish Matos-Ramos's intent to assault A.S. and recklessly inflict substantial bodily harm.

As in Daniels, the trial court here properly admitted evidence of Matos-Ramos's other acts that caused A.S.'s prior injuries to show Matos-Ramos's knowledge of the risk of the harm. The trial court recognized that whether Matos-Ramos intended to cause A.S.'s fractured femur "[wa]s the central issue at trial." Thus, the court concluded that the evidence "would be relevant as it does tend to show that the injuries may have been a result of an intentional act of the Defendant rather than an accident."

---

[46] Id.

[47] Powell, 126 Wn.2d at 262.

Because Matos-Ramos's intent was also at issue, evidence of his other acts was admissible to show his intent under ER 404(b). Thus, the trial court did not abuse its discretion in admitting this evidence.

## CHILD HEARSAY

Matos-Ramos argues that the trial court abused its discretion by admitting A.S.'s hearsay statements. We hold that the statements were properly admitted.

RCW 9A.44.120 governs the admissibility of child hearsay statements and states in relevant part:

> A statement made by a child when under the age of ten describing . . . any act of physical abuse of the child by another that results in substantial bodily harm . . . , not otherwise admissible by statute or court rule, is admissible in evidence in . . . criminal proceedings . . . in the courts of the state of Washington if:
> (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
> (2) The child either:
> (a) Testifies at the proceedings; or
> (b) Is unavailable as a witness[.]
> . . . .

A trial court has broad discretion to determine the reliability of a child hearsay statement, as it had the opportunity to observe the child and other witnesses.[48] We review for abuse of discretion a trial court's decision to admit evidence.[49]

In State v. Kennealy, the supreme court identified nine factors applicable to determine the reliability of a child's out-of-court declarations:

---

[48] State v. Swanson, 62 Wn. App. 186, 191 n.1, 813 P.2d 614 (1991).

[49] Quaale, 182 Wn.2d at 196.

(1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statements, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the declarant's recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.[50]

Not every factor must be satisfied in every case.[51] But the factors must be "'substantially met.'"[52]

Prior to trial in this case, Matos-Ramos challenged A.S.'s statements to several witnesses. Here, his argument only focuses on A.S.'s statements to Officer Eckert and Susannah Marshall, the forensic interview specialist for children. Thus, our analysis is limited to the statements to these two individuals.

Before the trial court made its decision on this issue, it heard Officer Eckert's testimony and reviewed several witness reports and statements. The trial court considered all of the Ryan factors, except for factors six and seven, stating that these factors were not meaningful to the analysis. The trial court determined that A.S.'s statements provided sufficient indicia of reliability for admission. On appeal, only factors one, two, four, and five are at issue.

---

[50] 151 Wn. App. 861, 880, 214 P.3d 200 (2009) (citing State v. Ryan, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984)).

[51] State v. Woods, 154 Wn.2d 613, 623, 114 P.3d 1174 (2005).

[52] Id. at 623-24 (quoting State v. Swan, 114 Wn.2d 613, 652, 790 P.2d 610 (1990)).

*Apparent Motive to Lie*

Matos-Ramos argues that the record does not support the trial court's conclusion that A.S. had no motive to lie to Officer Eckert and Marshall. We disagree.

"The critical inquiry is whether the child was being truthful" when he or she made the hearsay statements.[53]

Here, Officer Eckert testified pretrial about her conversation with A.S. She questioned him about his injury near the ambulance while first responders were present and heard the conversation. A.S. initially stated that he ran towards a table. Additionally, A.S. told Officer Eckert that Matos-Ramos kicked him. A.S. also told two of the first responders in the ambulance that it was a secret. The following day, A.S. disclosed to Marshall, the forensic interview specialist for children, that Matos-Ramos kicked him.

The trial court also considered transcripts of Detective Heather Castro's interview with Matos-Ramos and A.S.'s mother after the incident. Detective Castro asked Matos-Ramos if A.S. had the tendency to lie. Matos-Ramos responded that A.S. does lie. But Matos-Ramos also explained that A.S. would "not say something [be]cause he's afraid it's [going] to get him in trouble but not to the point where he'll just make up something like this." Matos-Ramos further explained his concern of how A.S. was questioned, stating that he will "just repeat back whatever we're saying."

---

[53] State v. Gribble, 60 Wn. App. 374, 383, 804 P.2d 634 (1991).

Detective Castro asked A.S.'s mother if she felt that A.S. would lie to get Matos-Ramos into trouble. She responded that she did not know because A.S. has lied. She also explained that in a prior incident, A.S. would not respond to questions or admit what he had done because he thought he would get into trouble. She further explained that A.S. repeats or picks up things said to him and that it is hard to tell what is true.

Pretrial, Matos-Ramos argued that A.S. might have lied to avoid getting in trouble. The trial court found that A.S.'s mother might have told him not to explain what really happened. But the court also found no evidence that A.S. had "anything to gain" by lying because "there was no evidence presented indicating that [A.S.] was going to get in trouble for the incident . . . ." Additionally, the trial court found that A.S. "feared what would happen after disclosing that the defendant had kicked him" and "desired to keep this information private." Thus, the trial court concluded that A.S. did not have a motivation to lie when he made the hearsay statements.

The record supports the trial court's conclusion. In addition to Matos-Ramos's statements discussed above, he also stated that he was surprised and did not understand why A.S. would say that Matos-Ramos kicked him. Similarly, A.S.'s mother stated that she did not know why A.S. would state that Matos-Ramos kicked him.

Additionally, A.S.'s grandmother's stated to a defense investigator that A.S.'s mother and Matos-Ramos "seem to say [that A.S. is] probably making things up." A.S.'s grandmother also stated that A.S. generally tells the truth and

that she has not witnessed him "mak[e] up stories or hav[e] an active imagination about things that go on around the house . . . ."

The record shows that A.S. may have lied and denied his involvement in certain situations if he believed he would get into trouble. But the record also supports the trial court's conclusion that A.S. did not have a motive to lie when he made statements to Officer Eckert and Marshall about this incident. Nothing in the record indicates that A.S. believed he would get into trouble before he made the challenged statements. Rather, Officer Eckert reassured A.S. that he was not in trouble and that she needed to know what had happened. And A.S. promised to tell Marshall the truth during the interview.

Additionally, nothing in the record indicates that A.S. heard or picked up something from someone else that would cause him to say that Matos-Ramos kicked him. Thus, the record supports the trial court's conclusion that A.S. did not have a motive to lie when he made the challenged statements.

Matos-Ramos also argues that A.S. had a motive to lie because he "bore animosity toward" and feared Matos-Ramos. Matos-Ramos relies on A.S.'s trial testimony where he testified that he was scared to see Matos-Ramos again and that Matos-Ramos "always scar[ed]" him. But A.S. testified during trial, not at the time of the court's hearsay ruling. There is nothing in this to suggest that the ruling would have been overturned on this basis.

Matos-Ramos relies on Ryan to argue that the motive factor "encompasses the diminished reliability that occurs" when a child makes different

16

and inconsistent statements. But that case is distinguishable and does not support that argument.

There, the State charged John Ryan with indecent liberties with two children.[54] The children's parents questioned the children about the source of the candy they possessed.[55] The children initially claimed one source of the candy but later stated that Ryan provided it.[56] The supreme court determined that the children had a motive to lie about the source of candy that they were not supposed to have.[57]

Here, conversely, nothing in the record shows that A.S. sought to hide any misbehavior of his. Thus, the record does not show that A.S. had the motivation to lie when he made the challenged statements. And despite A.S's initial statement about his injury to Officer Eckert and Marshall, the record shows that A.S. later disclosed that Matos-Ramos kicked him. These inconsistent statements, alone, do not establish that A.S. had the motivation to lie when he made the challenged statements.

*General Character of Declarant*

Matos-Ramos argues that the record does not support the trial court's conclusion regarding A.S.'s general character. We again disagree.

---

[54] Ryan, 103 Wn.2d at 167.

[55] Id. at 168-69.

[56] Id.

[57] Id. at 176.

This factor focuses on the child's reputation for truthfulness.[58]

Here, the trial court found that A.S. has a history of hyperactivity and has refused to admit things to avoid getting into trouble. The trial court also found that A.S. would sometimes "pick things up and make them his own story." Most importantly, the trial court found that A.S. was "an intelligent child" who did "not have a history of lying" and that "lying would be out-of-character for him." Thus, the court concluded that this factor had been satisfied. The trial court was in the best position to weigh properly the competing evidence.

Although the record does not support one of the trial court's findings, the record supports the trial court's decision. Specifically, first responder Genessa Olson allegedly overheard A.S. tell Officer Eckert that he was told to say that he ran into the table. Thus, the record does not support the trial court's finding that there was "no evidence that anybody told [A.S.] what to say" regarding the incident.

But the record supports the trial court's conclusion that this factor had been satisfied. Although the record shows that A.S. has lied to avoid getting into trouble, his grandmother stated that he generally told the truth. Matos-Ramos also stated that A.S. would "not say something [be]cause he's afraid it's [going] to get him in trouble but not to the point where he'll just make up something like this." A.S.'s mother similarly stated that she did not know why A.S. would state that Matos-Ramos kicked him.

---

[58] Kennealy, 151 Wn. App. at 881.

Thus, the trial court's erroneous finding made no difference to the outcome. These facts support the trial court's conclusion that this factor had been satisfied.

*Spontaneity*

Matos-Ramos argues that A.S.'s statements to Officer Eckert were not spontaneous. We agree.

Statements made in response to questioning are spontaneous so long as the questions are not leading or suggestive.[59]

Pretrial, Officer Eckert testified to her conversation with A.S. Near the ambulance, she asked A.S. what had happened to his leg. A.S. replied that he hit himself "on the table, running." Officer Eckert then asked: "Did anyone give you any owies today." A.S. responded: "Yes. My dad just kicked me" and pointed to his leg. Officer Eckert then asked why his dad kicked him, and A.S. responded: "For not reading. He kept kicking me." The trial court concluded that A.S.'s statements to Officer Eckert were spontaneous because they were made in response to open-ended, non-suggestive, and non-leading questions.

Matos-Ramos argues that the trial court incorrectly found that no one told A.S. what to say. This is true as we discussed above, but irrelevant to the court's ultimate conclusion. Matos-Ramos did tell A.S. to tell the table story. There is no evidence that anyone else tried to put words in A.S.'s mouth. So, this erroneous finding regarding spontaneity made no difference to the ultimate outcome regarding A.S.'s hearsay statements.

---

[59] Id. at 883.

19

*Timing and Relationship*

Lastly, Matos-Ramos argues that A.S.'s statements to Officer Eckert were unreliable under this factor. We disagree.

This factor focuses on "'the timing of the declaration and the relationship between the declarant and the witness.'"[60] The reliability of a child's statement may be enhanced when the testifying witness is in a position of trust with the child.[61] Additionally, this court has recognized that "[a]s long as there are law enforcement officers . . . investigating child abuse, . . . a child's statements will almost always be made after professionals become aware of the abuse."[62] This fact does not necessarily diminish the reliability of a child's statements, and in some situations, the presence of a police officer or nurse may enhance the statement's reliability.[63]

Here, the trial court found that A.S.'s statements to Officer Eckert were "contemporaneous with the incident." The court also found that Officer Eckert was a "professional witness" and stated that it did not have "any concern" regarding her lack of objectivity. The court then concluded that the "timing of these statements shows their reliability." We agree.

---

[60] Ryan, 103 Wn.2d at 176 (quoting State v. Parris, 98 Wn.2d 140, 146, 654 P.2d 77 (1982)).

[61] Kennealy, 151 Wn. App. at 884.

[62] State v. Young, 62 Wn. App. 895, 901, 802 P.2d 829 (1991).

[63] See id.; Kennealy, 151 Wn. App. at 884.

Matos-Ramos does not dispute the timing of A.S.'s statement to Officer Eckert. Rather, he argues that A.S. had no prior relationship with Officer Eckert and that the officer's position would "likely trigger a readiness to lie to avoid getting in trouble[] and a willingness to say what the officer apparently wanted to hear . . . ."

This argument is not supported by any citation to authority and is mere speculation. Accordingly, we reject it.

In sum, the record supports the trial court's conclusions as to the first, second, and fifth Ryan factors at issue here. Because the factors are substantially met, the trial court did not abuse its discretion in admitting A.S.'s hearsay statements to Officer Eckert and Marshall.

## CHILD COMPETENCY

Matos-Ramos argues that the trial court abused its discretion in finding A.S. competent to testify. We disagree.

Witnesses are presumed competent to testify until proved otherwise by a preponderance of evidence.[64] RCW 5.60.050 provides that witnesses are not competent to testify if they are "of unsound mind" or are "incapable of receiving just impressions of the facts, respecting which they are examined, or of relating them truly."[65]

---

[64] State v. Brousseau, 172 Wn.2d 331, 341, 259 P.3d 209 (2011).

[65] RCW 5.60.050.

The party challenging a witness's competency bears the burden of proving the witness's incompetency.[66] Courts are not required to "examine a child witness regarding the particular issues and facts of the case to determine competency."[67] Additionally, a witness's competence is presumed throughout the proceedings but may be challenged at any time.[68]

"The responsibility for determining a witness'[s] competency rests with the trial court, who 'saw the witness, noticed her manner[,] and considered her capacity and intelligence.'"[69]

We review for abuse of discretion a trial court's determination of a child witness's competency.[70] We examine the entire record in making this determination, even though a trial court determines a witness's competency pretrial.[71]

In State v. Allen, the supreme court established the "true test of the competency of a young child," which consists of the following factors:

> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression

---

[66] Brousseau, 172 Wn.2d at 341.

[67] State v. Avila, 78 Wn. App. 731, 736, 899 P.2d 11 (1995) (quoting State v. Przybylski, 48 Wn. App. 661, 665, 739 P.2d 1203 (1987)).

[68] Brousseau, 172 Wn.2d at 341.

[69] Avila, 78 Wn. App. at 735 (quoting State v. Johnson, 28 Wn. App. 459, 461, 624 P.2d 213 (1981), aff'd, 96 Wn.2d 926 (1982)).

[70] Brousseau, 172 Wn.2d at 340.

[71] Id.

of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.[72]

All five factors must be met before a child witness can be declared a competent witness.[73] Additionally, inconsistencies in a child witness's testimony go only to the child's credibility, not to admissibility of the testimony.[74]

Here, pretrial, Matos-Ramos challenged A.S.'s competency and requested a competency hearing. The court considered the same evidence that it considered for the hearsay issue and found A.S. to be "very intelligent," "playful[,] and somewhat distracted in demeanor." The court denied Matos-Ramos's motion for a competency hearing and permitted A.S. to testify at trial.

After A.S. and his mother testified at trial, Matos-Ramos again challenged A.S.'s competency, arguing that he did not take seriously the oath to testify truthfully. Matos-Ramos also expressed concern about A.S.'s ability to testify truthfully. The trial court disagreed, ruling that A.S. was competent to testify.

On appeal, only the first and third Allen factors are at issue.

*Obligation to Speak the Truth*

Matos-Ramos argues that A.S. did not understand his obligation to tell the truth. We disagree.

---

[72] State v. Allen, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967).

[73] In re Dependency of A.E.P., 135 Wn.2d 208, 223, 956 P.2d 297 (1998).

[74] Woods, 154 Wn.2d at 621.

A child's promise to tell the truth satisfies this factor.[75] And "[a] child's inability to express an understanding of the meaning of truth does not affect his competency as long as he possesses a sufficient understanding of truth to insure his testimony is not the result of fabrication or imagination."[76]

Here, during the pretrial proceedings, the trial court referred to A.S.'s interview with Marshall. There, Marshall asked A.S. a series of "real/pretend" questions and asked him if it were real or pretend that it was snowing in the room. A.S. responded:

> [A.S.]: Real.
> S. MARSHALL: Is it snowing in this room right now?
> [A.S.]: Nope.
> MARSHALL: Oh okay so is it real . . .
> [A.S.]: 'Cause it's...
> MARSHALL: . . . is it real or pretend?
> [A.S.]: . . . pre, pretend.[77]

The trial court found that A.S.'s answers "were made in a playful or teasing type of manner rather than a manner which would cause the [c]ourt concern that this child really believed it was snowing in the room."

A.S. was seven years old when he testified and promised to tell the truth. When the prosecutor asked A.S. if he knew the difference between a truth and a lie, he responded: "No." The prosecutor then tested A.S.'s ability to distinguish a truth from a lie and asked:

---

[75] State v. S.J.W., 149 Wn. App. 912, 925, 206 P.3d 355 (2009), aff'd on other grounds, 170 Wn.2d 92, 239 P.3d 568 (2010).

[76] State v. Sims, 4 Wn. App. 188, 190, 480 P.2d 228 (1971).

[77] Trial Exhibit 31 at 12.

24

Q: If I said my hair is green, what would you say?
A: It's not green.
Q: What color is it?
A: I don't know.
Q: You don't know?
A: No.

. . . .

Q: If I said my hair is orange, is that true?
A: No.
Q: Is that a lie?
A: Yeah.[78]

During cross-examination, A.S. stated that he knew the difference between a truth and a lie. When asked to explain his previous answer to the prosecutor, A.S. responded: "I don't understand."

After A.S. testified, Matos-Ramos challenged A.S.'s competency again. The trial court found that A.S. "underst[ood] the difference between truth and a lie, although sometimes the child may choose to lie."

The record supports the trial court's conclusion that A.S. was competent to testify. Contrary to A.S.'s initial statement during his testimony, the record shows that he understood the difference between a truth and a lie because he successfully completed the truth and lie exercises with Marshall. Marshall also used certain questions to determine A.S.'s ability to understand the consequences resulting from lies. For example, Marshall asked A.S. to select whether a lying character or a truthful character would get into trouble. A.S. selected the lying character as the one to get into trouble.

---

[78] Report of Proceedings Vol. V (December 5, 2013) at 484-85.

Overall, the first <u>Allen</u> factor has been satisfied because A.S. understood the difference between a truth and a lie, understood the negative consequences resulting from telling a lie, and promised to tell the truth before testifying.

Matos-Ramos argues that A.S. did not understand his obligation to tell the truth, relying on A.S.'s inconsistent statement regarding his understanding of the difference between a truth and a lie. Matos-Ramos also relies on A.S.'s allegedly "false[]" testimony, where he stated that he did not remember how he sustained his injury and stated that he pretends to sleep at night. But this testimony does not establish by a preponderance of evidence that A.S did not understand his obligation to tell the truth.

As previously stated, the record shows that A.S. knew the difference between a truth and a lie, despite his initial statement to the contrary, because he successfully completed the truth and lie exercises with Marshall.

Additionally, Matos-Ramos's allegation that A.S. made a false statement regarding his sleep does not, by itself, establish that he failed to understand his obligation to tell the truth. Matos-Ramos fails to explain otherwise.

Further, the fact that A.S. initially testified that he did not remember how he sustained his injury does not establish, by itself, that he failed to understand his obligation to tell the truth. Rather, this demonstrates his discomfort while testifying due to the many people present and "staring" at him.

More importantly, the fact that A.S. initially testified that he did not remember how he sustained his injury before he actually stated that Matos-Ramos kicked him shows that A.S. made an inconsistent statement. And any

inconsistencies in a child witness's testimony go only to the child's credibility, not to admissibility of the child's testimony.[79]

*Independent Recollection of Incident*

Matos-Ramos argues that A.S. did not have an independent recollection of the incident. We disagree.

A child's ability to recall the incident satisfies this factor.[80] "[A] child's reluctance to testify about specific acts of abuse does not render him or her incompetent."[81]

Here, pretrial, Matos-Ramos argued that the passage of time since the incident raised a "red flag." The trial court responded: "[A] simple passage of time is not affirmative evidence of incompetence. Of course, anybody can have difficulties remembering specifics over the time. But, that doesn't . . . constitute an affirmative showing of incompetence and is something that can be tested on cross-examination."

After A.S. testified, the court found that A.S. made conflicting statements. But it also found that A.S. had "a pretty impressive ability to recall" the events that took place. The court also stated that any "inability to recall details or conflict can go to the weight of the testimony rather than to the competence of the child."

The record establishes A.S.'s ability to independently recall the events surrounding his injury. A.S. testified about these events, explaining what he was

---

[79] Woods, 154 Wn.2d at 621.

[80] See S.J.W., 149 Wn. App. at 925-26.

[81] State v. Carlson, 61 Wn. App. 865, 875, 812 P.2d 536 (1991).

doing, where he was sitting before the incident, and who else was there. A.S. also described the incident in detail. A.S. further testified to events after the incident, including Matos-Ramos's call for the ambulance, the ambulance ride, and where he lived afterwards.

Based upon A.S.'s testimony, the trial court properly determined that A.S. could independently remember the incident. Thus, the trial court did not abuse its discretion in concluding that A.S. was competent to testify.

Matos-Ramos argues that A.S. did not independently recall the incident. He focuses on A.S.'s inability to independently remember that he lived with Matos-Ramos at the time of his injury. Matos-Ramos also focuses on A.S.'s "I don't know" response when asked how he sustained his injury.

But A.S.'s "I don't know" response does not establish that A.S. could not independently recall the incident. As previously stated, this response demonstrates his reluctance to explain what happened before he actually explained the circumstances. Additionally, A.S.'s inability to independently remember that he lived with Matos-Ramos does not establish that A.S. could not independently recall the incident. His detailed testimony about the circumstances surrounding his injury shows otherwise.

## JURY INSTRUCTION

Matos-Ramos argues that the trial court's failure to instruct the jury that all twelve jurors must be involved during deliberations violated his right to a fair trial and unanimous verdict. He did not request this instruction at trial. Because he

28

fails to establish that he falls within the narrow exception of RAP 2.5(a) for unpreserved claims, we do not reach the merits of this argument.

Under RAP 2.5(a), a party may raise for the first time on appeal "a manifest error affecting a constitutional right."[82] The party has the burden to show this.[83]

### Manifest Error

Matos-Ramos argues that the trial court's error is manifest. Not so.

To show such an error, a party must "make a plausible showing that the error resulted in actual prejudice, which means that the claimed error had practical and identifiable consequences in the trial."[84] "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest."[85]

Here, Matos-Ramos argues that "[t]he jury was essentially ignorant of how to reach a constitutionally unanimous verdict." He contends that "[n]othing informed the jurors [that] they could not deliberate in small groups over lunch," or while some jurors were absent while using the restroom.

---

[82] RAP 2.5(a)(3); see also State v. Lamar, 180 Wn.2d 576, 582, 327 P.3d 46 (2014).

[83] Lamar, 180 Wn.2d at 583.

[84] Id.

[85] State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

This record shows that the court gave the jury unchallenged instructions on their duty to deliberate. But there is nothing in this record to show what went on in the jury room. We simply do not know whether any of the claims he makes on appeal are real in this case. Absent such a showing, his assertions are entirely speculative. There is no showing of any manifest error. Accordingly, we do not reach the merits of this argument.

## DOMESTIC VIOLENCE FINDING

Matos-Ramos argues that the trial court improperly included a domestic violence finding in the judgment and sentence. The State properly concedes this error.

Here, the judgment and sentence includes a domestic violence finding and provides that domestic violence "was [pleaded] and proved." While the information alleged domestic violence, the jury never made such a finding.

The proper remedy for this error is to remand to the trial court to correct it.[86] We do so here.

## COSTS

Matos-Ramos argues that this court should decline to award the State appellate costs should the State prevail on appeal. We hold that there shall be no award of costs on appeal to the State.

---

[86] In re Pers. Restraint of Mayer, 128 Wn. App. 694, 701-02, 117 P.3d 353 (2005); see also CrR 7.8(a).

RCW 10.73.160(1) gives appellate courts discretion to decline to impose appellate costs on appeal.[87] Under State v. Sinclair, there is a presumption that indigency continues unless the record shows otherwise.[88]

Here, the trial court granted Matos-Ramos's motion to seek appellate review at public expense. Nothing in this record overcomes the presumption of his indigence. Thus, an award to the State for appellate costs is inappropriate under these circumstances.

We affirm the second degree assault conviction, vacate the domestic violence finding, and remand for correction of the judgment and sentence. We also deny any request for an award of appellate costs to the State.

_Cox, J._

WE CONCUR:

_Schindler, J._                _Becker, J._

---

[87] State v. Nolan, 141 Wn.2d 620, 629, 8 P.3d 300 (2000).

[88] 192 Wn. App. 380, 393, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016).