# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57099-8-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| E.A. | |
| Appellant. | |

MAXA, P. J. – EA appeals his juvenile court adjudication of guilty of first degree child rape. Eight-year-old DE told several adults that his 14-year-old cousin EA had sexually assaulted him multiple times. However, at the child hearsay hearing DE denied that EA had sexually assaulted him. After considering the *Ryan*[1] factors, the trial court ruled that DE's child hearsay statements to the adults were admissible under RCW 9A.44.120(1). Following a trial in which several witnesses testified about DE's hearsay statements, the trial court adjudicated EA as guilty.

EA argues that the trial court erred in applying the *Ryan* factors and in admitting DE's child hearsay statements. We hold that the trial court did not abuse its discretion in admitting the child hearsay statements. Accordingly, we affirm EA's adjudication of guilt.

---

[1] *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).

FACTS

*Background*

On September 22, 2021, Jack Chilla was supervising his second grade class as they lined up for lunch when DE attempted to cut in front of some of the other children. When Chilla told DE that he needed to return to his place in line, DE told Chilla that he had something to tell him and then disclosed that EA, DE's cousin, had been sexually abusing him.

DE subsequently made additional statements regarding sexual abuse by EA to the school's counselor Danielle Rosetta, sexual assault nurse examiner Heather McLeod, and forensic interviewer Deanna Moomjian-Gjovik.

Based on these statements, the State charged 14-year-old EA with first degree child rape in the juvenile court. The State moved to admit DE's hearsay statements under RCW 9A.44.120, and the case proceeded to a child hearsay hearing.

*DE's Hearing Testimony*

DE was still eight years old at the time of the June 2022 child hearsay hearing. The prosecutor initially questioned DE about his ability to tell the truth. She asked DE if he remembered from a prior visit to the courtroom what the most important chair in the room was. DE responded that it was "[t]he truth chair" and that it was called that "because that's where you tell the truth." Rep. of Proc. (RP) at 47. DE then correctly identified two statements by the prosecutor that were lies. And DE testified that it was good to tell the truth and bad to lie.

The prosecutor then asked DE if he remembered talking to anyone about EA. DE responded that EA had lived with his family but that EA had to move out "because of the lie I made up." RP at 52. DE testified that what he told Chilla was a lie and that EA had not touched

him inappropriately or asked him to keep anything secret. DE also testified that he got "in big trouble, because I lied about this." RP at 55.

*Chilla's Hearing Testimony*

Chilla testified that he was employed as a substitute teacher. He stated that he also had been a substitute teacher in DE's first grade class. Chilla stated that he liked DE and that DE was bright, nice, funny, and very shy.

On September 22, 2021, Chilla was the substitute teacher for DE's second grade class. As the children were lining up for lunch, DE suddenly jumped to the front of the line. The other children complained about DE cutting in line, so Chilla told DE that he needed to return to his place. DE responded by telling Chilla to bend down because he had something to tell him. When Chilla bent down, DE said, "My cousin makes me suck his penis." RP at 60. Chilla testified that when DE said this, his demeanor was "matter of fact." RP at 60.

Chilla stated that DE would not have been in trouble for cutting in line. The only consequence was that DE would have been sent back to his original place.

Chilla stated that he immediately reported DE's disclosure to the school counselor Rosetta. Chilla escorted DE to Rosetta's office. When Chilla told DE to repeat what he had said to Rosetta, DE repeated it.

*Rosetta's Hearing Testimony*

Rosetta testified that Chilla brought DE to her and told her that she needed to talk to DE because he had told Chilla something serious. At that point, DE stated "that his cousin makes him suck his penis." RP at 67. Because Rosetta was in the midst of something else, she sent DE back to class with Chilla. But she met with DE one-on-one about 20 minutes later. DE did not act as if he thought he was in trouble.

During Rosetta's meeting with DE, he told her that EA made him suck his penis, that DE did not like it, that it was really gross, and that he hoped his cousin would get in trouble. DE also told Rosetta that his cousin lived in the same house as he did and that his cousin had also attempted "to put his penis in [my] butt." RP at 69. DE told Rosetta that he had not disclosed this to anyone else and that EA had said it was a secret. Rosetta testified that she was concerned about how anxious DE appeared to be and the intensity with which he was reporting this information.

Rosetta ended her conversation with DE and contacted Child Protective Services (CPS). Officer Britany Stigall then came to the school and met with DE.

Rosetta testified that this was her first one-on-one contact with DE and that she did not know him well. But she had never had any experience with DE in which he disclosed something that was not true. Rosetta denied coaching DE or asking him leading questions during their conversation.

Rosetta also testified that after DE's disclosures but before the hearing, she was in a parent teacher conference for DE's brother and DE's mother would not give her permission to interact with her children. Rosetta further testified that a short time before the hearing, DE's younger brother saw her in the school hallway and he stopped, pointed at her, and said, "I'm not allowed to talk to you." RP at 71. Rosetta also testified that at the end of the school year she had been conducting a lesson in DE's second grade class and that DE appeared to be upset. At the end of the lesson, DE raised his hand and said that he was not returning to the school because his parents did not trust the school.

*Officer Stigall's Hearing Testimony*

Stigall testified that when she arrived at the school, Rosetta told her about DE's allegations. Stigall then talked with DE and asked him about his family and if he felt safe being at home. DE told her that he had had nightmares about monsters, but he felt safe at home because he had not had them lately. Stigall did not discuss DE's disclosures with him. Stigall had never had any contact with DE before this.

Stigall testified that she then contacted DE's mother, told her what was going on, and asked to speak to her. At DE's mother's request, Stigall took DE to his mother's workplace.

By the time Stigall and DE got to his mother's workplace, DE's little brother already had arrived on the school bus. Stigall sent the two boys inside so she could speak to their mother alone.

Stigall then told DE's mother about the allegations and explained the investigation process. Stigall wanted to ensure that DE's mother had this information so she could keep EA and DE separate.

DE's mother was upset and did not appear to believe DE's allegations. She told Stigall that she had been a sexual assault victim, that she knew "what that looks like," and that she did not see any signs of abuse in her son. RP at 85. DE's mother also commented that DE was never alone with EA, so she was not sure how this could have happened.

Stigall explained to DE's mother that children respond to trauma in a variety of ways, so the fact she did not recognize it did not mean it did not happen. DE's mother then expressed concern that DE would be expelled from or be in trouble at school. Stigall reassured her that DE was not in trouble and told her that all they wanted to do was to find out what had happened and to keep DE safe.

When Stigall advised DE's mother that CPS would be notified, she became upset. DE's mother commented that "where she was from, people don't take kindly to CPS because they take people's children away." RP at 86. Stigall reassured DE's mother that it was not their intention to take DE.

Initially, DE's mother also did not want DE to undergo a forensic interview. But Stigall explained the process and emphasized that this was the best way to figure out what had happened. Stigall then called the social worker, Colleena Will, and set up the sexual assault evaluation.

Stigall also testified about EA's arrest and EA's father's reaction to the arrest. When the officers arrived to arrest EA, his father, Ron Lindsay, was hostile and told the officers that they were not taking his child. After they talked with Lindsay for a while and gave him more information, he delivered EA to Stigall. Stigall testified that Lindsay was present when EA was interviewed before the arrest and that Lindsay had been very upset with her.

*Will's Hearing Testimony*

Will, the social worker involved in the case, testified that after she received the report of the abuse allegations, she arrived at DE's mother's workplace unannounced. Will had a short meeting with DE's mother. Will said that she needed to meet with the children. When DE's mother brought DE and his brother out from the back room, they were crying so hard they were difficult to understand.

Will testified that she interviewed each child separately. She first talked with DE's brother and reassured him that he was not in trouble and that she was not trying to take him from his mother. After he calmed down, they talked about safety and who he felt safe with. When she

6

asked about EA, DE's brother told Will that EA made DE and himself do inappropriate things and said that EA made them suck EA's penis.

Will then met with DE, whom she did not know before this contact. They discussed his safety and whether he felt safe at home. They did not discuss the allegations.

DE told Will that he normally lived with his parents, but his father had just been deployed. He also stated that he lived with EA, EA's father Lindsay, and a grandmother.

Will then spoke with DE's mother, and they were joined by EA's mother after a few minutes. They did not discuss what the boys had told Will, but DE's mother was adamant that nothing had happened. DE's mother stated that she would only believe something had happened if the boys told her so.

Will attempted to explain to DE's mother that there are reasons that victims sometimes first disclose abuse to people who are not their parents and emphasized that it was important for a child's parents to believe them. Will also instructed the mothers not to discuss the case with or around the children so the interviews would be "clean." RP at 101.

During this meeting, the mothers warned Will to be careful because Lindsay would be upset. Sometime later, Lindsay called Will. He was upset, and he yelled, screamed, and swore at Will. He accused her of lying about EA. And he threatened to have his children make up lies about Will and her conduct during the investigation.

When Will attended the forensic interviews, the families were present and they were loud, upset, and yelling. To avoid creating more conflict, Will remained in the back. The families were so upset that Will feared for her safety.

*McLeod's Hearing Testimony*

McLeod is a sexual assault nurse examiner. She saw DE as a patient in September 2021 shortly after he had disclosed the sexual abuse.

McLeod testified that when she conducted her examinations, she would ask non-leading questions and that she avoided coaching children for answers. She also testified that children often delay disclosure or do not disclose sexual abuse for many reasons, including shame, embarrassment, concern that they will not be believed, concern that they will be blamed for what happened, fear related to family dynamics, and pressure to protect an offender or others.

McLeod testified that DE had Attention Deficit and Hyperactivity Disorder (ADHD) and that he took medication for this condition. During her examination of DE, he reported that EA had made him suck his penis and had put his penis "up his butt." RP at 156. DE reported this had happened multiple times in multiple places inside the home and that he did not like it. DE also reported that EA told him to keep it a secret and that EA would give him Kool-Aid or snacks if he would comply with EA's requests. DE described how it felt when EA put his penis in his butt. DE also told McLeod that EA had asked him to suck on his scrotum.

DE stated that he initially did not want to engage in these activities and that he did not like it. But DE eventually thought that he and EA were friends, and EA told him that friends do this when someone asks them to.

Well into the examination, DE told McLeod that he was telling the truth but nobody believed him. McLeod told DE that she believed him. McLeod testified that if someone came to her for medical care, she would "start from a place of believing them" until she saw something inconsistent that raised a concern," and she did not see any reason to be concerned about DE's veracity during this visit. RP at 164.

McLeod also asked DE if he was aware of EA abusing anyone else, and DE said that EA had forced DE's brother to suck on EA's penis. DE stated that when this happened, his brother wanted to tell, but EA told him that if he told he would not get Kool-Aid and would not be able to be in the room they were in. DE also told McLeod that his mother had said that EA also had molested his own sister. McLeod did not interview EA's sister.

McLeod also examined DE's brother. DE's brother did not disclose sexual abuse by EA. But DE's brother told McLeod that DE "was in trouble with their uncle" and that DE had "gotten him into this mess." RP at 163. DE's brother stated that EA had said this was a secret, but DE had told.

*Moomjian-Gjovik's Hearing Testimony*

Moomjian-Gjovik testified about her forensic interview of DE, which occurred on September 28. The video of the interview was entered into evidence for purposes of the hearing, and the trial court reviewed portions of the tape.

During this interview, DE stated that he was in second grade but that he could not "go to school anymore, because of something [indiscernible] at school." RP at 123 (alteration in original). When Moomjian-Gjovik asked for clarification, DE responded, "Somebody is fishy and stuff." RP at 123. Moomjian-Gjovik replied, "Stuff is getting fishy, is that what you said?" And DE responded, "Yes. That means something mysterious." RP at 123.

Moomjian-Gjovik then asked DE what was mysterious about what was happening at school. DE responded that it was about what he had said and that he would be attending a different school. Moomjian-Gjovik asked DE what he had said, and DE stated that he had said that EA had put his penis in DE's butt and mouth.

Moomjian-Gjovik then asked DE where the sexual contact had happened. DE responded that it had occurred in the room EA and Lindsay shared. Moomjian-Gjovik then asked DE to tell her about the first time EA put his penis in DE's mouth. DE could not remember when the first incident occurred, but he stated that it happened in an upstairs bathroom when he, his brother, and EA were playing hide and seek. DE also stated that it usually happened in EA's and Lindsay's room.

Moomjian-Gjovik asked DE when EA stopped asking him to suck on his penis, and DE responded that it did not stop. DE stated that he did not want to do it, but EA said he would give DE Kool-Aid. DE said that he wanted the Kool-Aid and that EA would also let him have a snack.

EA told DE that it was a secret. DE also described how it felt and said that it happened "like a 100 or a lot of times." RP at 140.

Moomjian-Gjovik also asked DE to tell her more about when EA put his penis in his butt and what it felt like. DE responded that EA did not do that often and that he did not remember the first time, but it happened in Lindsay's room. DE also described what it felt like and said that he had asked EA to stop but he did not listen.

When Moomjian-Gjovik asked DE about who lived in his house, DE responded that his mother and father did and then stated that his father was in the Army but was returning "because I stopped him from [his] work." RP at 130. Moomjian-Gjovik asked DE to clarify how he stopped his father's work and who told him this. DE responded that his mother had told him and that his father was returning because of the case.

*DE's Father's Hearing Testimony*

DE's father testified that he had witnessed DE making up stories. But he further testified that DE was eight years old and that he did not know any child that age who did not make up stories.

DE's father also testified that DE responded differently to getting into trouble depending on the situation. But he stated that DE "tend[ed] to redirect his statements towards something else." RP at 170. DE would also attempt "to lie his way out of things to not get into trouble, but he [wasn't] very good at it." RP at 170. If DE was caught lying, they would impose more punishment.

DE's father also testified that EA had been living in the same house with DE since 2018. Before this event, DE's father had not seen any indication of abuse between EA and DE. He stated that the two children were very different. DE was interested in playing and was extremely active, but EA liked video games and rarely left his room.

DE's father denied telling DE what to say or what not to say regarding his allegations and stated that they had only asked DE "to hold himself accountable and to be truthful." RP at 172. DE's father had no concern about letting DE and EA be together in the future.

DE's father also testified that DE had never disclosed any abuse to him and that he would have reported it if DE had done so. He stated that there was zero tolerance for sexual violence in their home. And he testified that sexual abuse had occurred in his wife's family, that his wife was a victim, and that they did not want it to happen to their children.

*DE's Mother's Hearing Testimony*

DE's mother described DE as hyper. She testified that they had problems with him "try[ing] to lie to [them] a lot of the times, but [they] have been working on that." RP at 179.

She stated that DE was just hyper and very imaginative and that he sometimes overused his imagination.

DE's mother also stated that DE frequently got in trouble and that if he got caught, he would "usually tr[y] to lie his way out of it." RP at 181. But she stated that if he got caught lying "he takes his discipline, whether it be grounding or losing one of his favorite toys, with grace." RP at 181.

DE's mother testified that when she learned about DE's disclosures, she was shocked and could not understand how it happened because EA and DE were never alone together. She also testified that DE told his father that he had lied about his accusations. But DE had never told her why he had lied. DE's mother denied coaching DE.

DE's mother also testified that Lindsay was her brother. She stated that Lindsay had to quit his job to support EA after DE made his accusations. She also testified that after DE made his disclosures, EA had to live with his mother. When EA moved, his sister moved into DE's residence.

DE's mother denied telling DE that he had stopped his father from working. She stated that although she had told DE that his father was coming home, she did not tell him why. But she commented that DE probably could have figured out the reason by himself.

DE's mother also denied telling her boys that CPS was going to take them away as a result of DE's disclosures, that "something fishy" was going on at the school, that she mistrusted school staff, or that they could not talk to school staff or to CPS. RP at 190. But she admitted that she was concerned that CPS would remove her children as a result of the allegations. And she further admitted that she would "break a rule" to keep her children from being taken away because she believed that she would be protecting them. RP at 193.

12

*Trial Court's Ruling*

After hearing argument, the trial court stated that the court "in [t]his proceeding is, according to the statute, trying to decide whether or not there was sufficient [indicia] of reliability for a child under the age of 10 describing a sex act that was performed." RP at 202-03. It then addressed the *Ryan* factors, which are intended to assist the courts in determining the admissibility of child hearsay statements.

Based on *Ryan* factors 1 through 5, the trial court concluded that DE's hearsay statements were admissible. The court made no findings related to factors 6 through 9.

The trial court then issued written findings of fact and conclusions of law regarding the child hearsay statements. As it did in its oral ruling, the court found that *Ryan* factors 1 through 5 weighed in favor of admitting the hearsay statement. And it did not address factors 6 through 9 other than to acknowledge in factor 7 that DE was available for cross-examination.

The trial court concluded that DE's statements to Chilla, Rosetta, Will, McLeod, and Moomjian-Gjovik were admissible. The court also concluded that the admitted portions of the forensic interview also were admissible at trial under RCW 9A.44.120.

*Bench Trial*

During the bench trial, DE again denied that EA had sexually abused him. DE also testified that he had gotten in trouble because his allegations were a lie. He further testified that he had lied about EA because his uncle and grandmother had been fighting because his grandmother was stealing things and accusing the other family members of doing so.

Chilla, Rosetta, Stigall, Will, McLeod, and Moomjian-Gjovik testified consistently with their testimonies at the child hearsay hearing. The trial court also admitted the video of Moomjian-Gjovik's forensic interview, which it had watched during the child hearsay hearing.

EA's only witness was EA. EA denied sexually assaulting DE. But he admitted that he would occasionally be left alone with DE and DE's brother when their parents ran short errands.

The juvenile court adjudicated EA guilty of first degree child rape. EA appeals the adjudication of guilt.

## ANALYSIS

EA argues that the trial court erred when it ruled that DE's hearsay statements were admissible under RCW 9A.44.120(1). We disagree.

A.   LEGAL PRINCIPLES

RCW 9A.44.120(1) states that the otherwise inadmissible hearsay statements of a child witness under the age of 10 are admissible in a criminal case when (1) the statements describe sexual or physical abuse of the child; (2) the court finds that the time, content, and circumstances of the statements provide sufficient indicia of reliability; and (3) either the child testifies at the proceedings or the child's statements are supported with corroborative evidence of the act. *State v. Kennealy*, 151 Wn. App. 861, 880, 214 P.3d 200 (2009).

In determining whether the child witness's statements are reliable, the trial court considers nine factors known as the *Ryan* factors. *Kennealy*, 151 Wn. App. at 880. These factors are

> (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statement, (4) the spontaneity of the statements, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contained express assertions of past fact, (7) whether the declarant's lack of knowledge could be established through cross-examination, (8) the remoteness of the possibility of the declarant's recollection being faulty, and (9) whether the surrounding circumstances suggested the declarant misrepresented the defendant's involvement.

*Id.* (footnote omitted). For the child hearsay statements to be admissible, the trial court must find that these factors are substantially met, but all nine factors need not be satisfied. *Id*. at 881. And

"[n]o single Ryan factor is decisive and the reliability assessment is based on an overall evaluation of the factors." *Id.* at 881.

Because the trial court has the opportunity to see and to evaluate the child and the other witnesses, it is in the best position to determine the reliability of child hearsay statements. *State v. Pham*, 75 Wn. App. 626, 631, 879 P.2d 321 (1994). As a result, "[t]he trial court is necessarily vested with considerable discretion in evaluating the indicia of reliability." *State v. C.J.*, 148 Wn.2d 672, 686, 63 P.3d 765 (2003).

Accordingly, we review a trial court's decision to admit child hearsay statements for an abuse of discretion. *Kennealy*, 151 Wn. App. at 879. "A trial court abuses its discretion when its evidentiary ruling is manifestly unreasonable or is based on untenable grounds or reasons." *Id.* However, "[w]e may uphold a trial court's evidentiary ruling on the grounds the trial court used or on other proper grounds that the record supports." *Id.* When the trial court errs by misapplying the *Ryan* factors, the appellate court may affirm the admissibility of child hearsay statements "when the reliability of the statements at issue is apparent from the record." *State v. Stevens*, 58 Wn. App. 478, 487, 794 P.2d 38 (1990).

We review a challenge to a trial court's findings of fact to determine if substantial evidence supports them. *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). Substantial evidence is evidence that is sufficient to persuade a fair-minded person of the truth of the premise stated. *Id.* at 106. The party challenging the finding of fact bears the burden of demonstrating that the finding is not supported by substantial evidence. *State v. Smith*, 185 Wn. App. 945, 957, 344 P.3d 1244 (2015). We review challenges to the court's conclusions of law de novo. *Homan*, 181 Wn.2d at 106.

B.      FINDING OF FACT 5

EA argues that the trial court's finding of fact 5 shows that the court erroneously believed that the child's credibility is part of the Ryan analysis. We disagree.

Finding of fact 5 stated, "The Court considered whether there was a sufficient indicium of reliability to determine whether a child under the age of 10 describing a sex act that was performed." Clerk's Papers (CP) at 38.

RCW 9A.44.120(1) provides that under certain circumstances hearsay statements made by a child under 10 years old that describe acts of sexual contact performed on or with the child by another are admissible if the court finds "that the time, content, and circumstances of the statement provide sufficient indicia of reliability." Finding of fact 5 appears to be an attempt to reflect the trial court's opening statement during its oral ruling in which it acknowledged RCW 9A.44.120(1). In its oral ruling, the court stated, "So the Court, in [t]his proceeding is, according to the statute, trying to decide whether or not there was sufficient [indicia] of reliability for a child under the age of 10 describing a sex act that was performed." RP 202-03.

Although the written finding may have been poorly drafted, we conclude that finding of fact 5 demonstrates only that the trial court was considering the requirements of RCW 9A.44.120(1), not that the court misunderstood the *Ryan* analysis.

C.      APPLICATION OF *RYAN* FACTORS

EA argues that the trial court erred in applying the *Ryan* factors, and that a proper application leads to the conclusion that DE's hearsay statements were not admissible under RCW 9A.44.120(1). We disagree.

16

1.    Factor 1: Apparent Motive to Lie

The trial court addressed the first *Ryan* factor, whether EA had an apparent motive to lie, in finding of fact 6.a.  Finding 6.a stated,

i.      There is not a strong motive to lie by D.E.
ii.     Avoiding a punishment for cutting in line and making up an allegation of a sex offense is disproportionate, even in a child's mind, for trying to escape whatever punishment might come from cutting in line.
iii.    Therefore, the Court does not find a strong motive to lie.
iv.     This factor weighs in favor of admission of D.E.'s statements.

CP at 38.

EA argues that finding of fact 6.a shows that the trial court applied the wrong legal standard because factor 1 does not (1) require a *strong* motive to lie before the court can find that this factor weighs against admission of the child hearsay statements, or (2) require the court to assess whether the statement is a proportionate reaction.

EA is correct that factor 1 does not require a "strong" motive to lie.  This factor requires that the trial court consider only whether the declarant had an *apparent* motive to lie.  *Keneally*, 151 Wn. App. at 880.  But the remainder of finding 6.a shows that this error was irrelevant to the court's determination that factor 1 weighed in favor of the admission of DE's hearsay statements.

In finding 6.a.ii the trial court concluded that the accusation of abuse was so disproportionate to the potential punishment for attempting to cut in line – DE having to return to his place in line – that it was not reasonable to conclude that DE made the statement for the purpose of avoiding punishment.  The trial court can consider the reasonableness of the potential motive when examining this factor and whether a response is proportionate or disproportionate is relevant to reasonableness.  *See State v. Leavitt*, 111 Wn.2d 66, 74, 758 P.2d 982 (1988) (although testimony suggested the child had a motive to lie, this potential motive was not persuasive because it was not reasonable).

17

The avoidance of punishment certainly can provide a motive to lie. *See Ryan*, 103 Wn.2d at 168, 176 (the desire to avoid punishment for having candy was a motive to lie). But the trial court's determination that under the facts of this case lying about sexual abuse would be an unreasonable response to being chastised for cutting in line was within the court's discretion.

We conclude that the trial court did not abuse its discretion in applying factor 1 despite misstating the factor.

2.    Factor 2: General Character of the Declarant

The trial court addressed the second *Ryan* factor, DE's general character, in finding of fact 6.b.  Finding 6.b stated,

i.      D.E. testified in front of the court, was very hard to understand, and was difficult to follow.
ii.     D.E. suffers from ADHD for which he is medicated.  Despite that medication D.E. was still very difficult to follow at times.
iii.    However, he was able to explain through questioning to the Court that it was wrong to tell lie[s], what the difference was between a falsehood, or a non-falsehood, or a lie or a truth, and understood that it was wrong to tell a lie.
iv.     D.E. was able to recall simple matters with some detail, not good at times, which is not surprising based on his age which makes it difficult to discern time.
v.      D.E. was able to discern certain events that were important to him, certain toys that were important, and when approximately he received those toys.
vi.     The Court does find that the declarant's general character was one that was of a competent nature to testify and *no inherent deceitful nature* that was testified to other than normal behavior by someone of D.E.'s age[.]
vii.    D.E.'s character was *not one that causes concern that his disclosures were inherently unreliabl*e.
vii[i].    This factor weighs in favor of admission of D.E.'s statements.

CP at 38-39 (emphasis added).

EA argues that findings 6.b.vi and 6.b.vii demonstrate that the trial court applied an incorrect standard because this factor did not require the court to find that the child had an *inherently* deceitful nature or that the child's character was one that causes concern that the

disclosures were *inherently* unreliable. And he asserts that these standards required levels of untrustworthiness that were too high. He argues that the court should have assessed only DE's general reputation and character for truthfulness.

The second *Ryan* factor is the declarant's general character. *Kennealy*, 151 Wn. App. at 880. "When assessing a child's general character, [the courts] look to whether the child has a reputation for truthfulness." *Id.* at 881. A reputation is "the estimation in which one is generally held: the character commonly imputed to one as distinct from real or inherent character." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1929 (2002). Because one's reputation can be distinct from one's inherent nature, the trial court's reference to DE's "inherent" nature in finding 6.b.vi and "inherently" unreliable in finding 6.b.vii was incorrect.

But the record shows that DE did not have a reputation for untruthfulness at school. And it also shows that although DE may have told some lies at home, his father testified that his behavior at home was similar to that of other children of the same age. These facts are sufficient to support the conclusion that DE's reputation for truthfulness was not such that it made his disclosures unreliable.

EA also argues that it was error for the trial court to evaluate DE's testimonial competence in finding 6.b.vi. EA contends that a child witness's testimonial competency is a separate determination that is not relevant to any of the *Ryan* factors.

In *C.J.*, the Supreme Court held that testimonial competency is not a prerequisite to admissibility of child hearsay under RCW 9A.44.120. 148 Wn.2d at 683-84. The trial court's discussion of DE's testimonial competence is irrelevant to factor 2. But the inclusion of this extraneous analysis is irrelevant.

Although the trial court erred in one aspect of its analysis of factor 2, we conclude that this factor either weighs in favor of admissibility or is neutral. But as noted above, no one factor is determinative. *Kennealy*, 151 Wn. App. at 880.

### 3. Factor 3: Whether More Than One Person Heard the Statement

The trial court addressed the third *Ryan* factor, whether more than one person heard the statement, in finding of fact 6.c. CP 39. Finding 6.c stated:

> i.  No one person at one time heard the statements that were testified to. However, there were a number of individuals that heard the same disclosure that were very similar in nature, [i]f not somewhat identical. These statements were testified to by the original substitute teacher, the school counselor, the sexual assault evaluation nurse, and during the forensic interview.
>
> ii.  Multiple individuals heard very similar, even though not the exact same disclosure, that were only different in time, being made.
>
> iii.  This factor weighs in favor of admitting D.E.'s statements.

CP at 39.

EA argues that DE's statements to Rosetta and the later adults do not denote reliability because they were the result of DE being told to repeat what he told Chilla. But DE did more than repeat what he said to Chilla. Each time DE talked about the abuse he provided the same information and he elaborated on this information and provide additional information. This demonstrates that DE was not just telling the later adult what he had originally said to Chilla. And when a child tells similar stories to several individuals over time, "the hearsay statement is more reliable." *Kennealy*, 151 Wn. App. at 883.

We conclude that the trial court did not abuse its discretion in applying factor 3.

### 4. Factor 4: Spontaneity

The trial court addressed *Ryan* factor 4, whether the statements were spontaneous, in finding of fact 6.d. Finding 6.d stated:

> i.  The original disclosures by D.E. appear to have been made spontaneously, jarringly so.

ii. The Court finds it difficult to connect how the instruction to get in line, or get back in line, would result in a disclosure of this nature. However, that is what D.E. testified to and the Court finds that is what the facts reflect show, that the disclosure was spontaneous in nature.

iii. Additionally, the video of forensic interview, and the discussion of going to school, and the testimony from D.E. that he would not be going to that school anymore, because of his disclosures, was spontaneous. There was no coaching, or leading questions, which broached the subject of the disclosures until the child broached those disclosures. This finding was focused only on the disclosures that were made by D.E.

iv. This factor weighs in favor of admitting the statements that D.E. made.

CP at 39-40.

EA argues that DE's original statement to Chilla was not spontaneous because, considered in context, it is clear that DE was making the statement as a way of deflecting attention away from himself and not, as the court found, as a spontaneous disclosure. But as the trial court found when addressing factors 1 and 4, DE's disclosure of sexual abuse was so entirely unrelated to his behavior or the potential consequences of his behavior, that the argument that DE made the allegations to deflect attention away from his transgression is not reasonable.

EA also argues that DE's responses to Moomjian-Gjovik's questions were not spontaneous because her questions were leading. "[S]tatements made in response to questioning are spontaneous so long as the questions are not leading or suggestive." *Kennealy*, 151 Wn. App. at 883. Moomjian-Gjovik's questions when she interviewed DE were open ended and did not suggest that DE should respond with a statement about sexual conduct.

We conclude that the trial court did not abuse its discretion in applying factor 4.

5. Factor 5: Timing of Statements and Relationship Between Declarant and Witness

The trial court addressed *Ryan* factor 5, the timing of the statements and the relationship between the declarant and the witness, in finding of fact 6.e. Finding 6.e stated:

21

i.      D.E. was unable to put any type of book-end on the timing that was involved. However, D.E. did testify that all of the related parties were living together at the time.

ii.     D.E. was subject to cross-examination and did not affirm, and did disavow, the statements that were made, and there are likely reasons for that. However, this Court does find that the trier of fact should have that information when it is making its determination regarding whether or not these incidents did occur, beyond a reasonable doubt.

CP at 40.

EA argues that the trial court erred as a matter of law because it addressed whether the accusations matched the charging period rather than whether DE's relationship to those he disclosed to and found that the circumstances established trustworthiness.

The trial court's finding regarding timing is vague and does not really address when the disclosure was made in relation to when the sexual abuse occurred. Factor 5 also requires the trial court to "consider when the child's statement was made to a hearsay witness and what the witness's relationship is to the child." *Kennealy*, 151 Wn. App. at 884. The trial court's findings on this factor did not address DE's relationship with those he made the disclosures too. And finding 6.e.ii has nothing to do with this factor. Accordingly, EA is correct that this finding is erroneous in that is does not really analyze factor 5.

But we can determine, based on this record, that this factor weighs in favor of admissibility of the child hearsay statements. *Kennealy*, 151 Wn. App. at 879; *Stevens*, 58 Wn. App. at 487. DE's disclosures to Chilla and Rosetta were stated in the present tense, suggesting that the abuse was ongoing at the time of the disclosures. And when Moomjian-Gjovik asked DE when EA stopped asking him to suck on his penis, DE responded that it did not stop. Therefore, the timing of the disclosures weighs in favor of admissibility.

Regarding the relationship between DE and the witnesses, the record shows that DE made three of the disclosures to school officials and a nurse. Even though Chilla, Rosetta, and

McLeod did not know DE well, they still were authority figures in positions of trust in relation to DE. And when the witness to whom the child made his or her disclosures is in a position of trust with the child, "this factor is likely to enhance the reliability of the child's statement." *Kennealy*, 151 Wn. App. at 884.

Accordingly, although the trial court's findings on this factor were not correct, the evidence demonstrates that factor 5 weighs in favor of admissibility.

6.     Factors 8 and 9:  Possibility of Faulty Recollection and Surrounding Circumstances

Other than a finding that DE was available for cross-examination, the trial court made no findings regarding factors 6 through 9.[2] EA challenges the lack of findings for factor 8, whether the possibility of DE's recollection being faulty is remote, and factor 9, whether the circumstances surrounding the statements give no reason to suppose that the declarant misrepresented the defendant's involvement. EA argues that the trial court's failure to address factors 8 and 9 was error because these factors were crucial in this case and they clearly were unmet.

Factors 8 and 9 are already addressed in factors 4 and 5 and "are not very helpful in assessing the reliability of child hearsay statements in most sexual abuse cases." *State v. Henderson*, 48 Wn. App. 543, 551 n. 5, 740 P.2d 329 (1987). Also, it is not necessary that every factor be satisfied; a court properly exercises its discretion if the factors are "substantially met." *State v. Swan*, 114 Wn.2d 613, 652, 790 P.2d 610 (1990).

---

[2] EA does not argue that the trial court erred in making no findings regarding factor 6, whether the statements contained express assertion of past facts, or factor 7, whether the cross-examination could not help to show the declarant's lack of knowledge.

Factors 1 through 5 support the trial court's conclusion that DE's hearsay statements were admissible. Accordingly, we conclude that the trial court did not err in declining to make findings regarding factors 8 and 9.

### 7. Effect of DE's Recantation

EA argues that the fact DE recanted demonstrates that his statements were unreliable and therefore inadmissible. He emphasizes that DE's hearsay statements were untrustworthy when he could state that he was sexually abused and then turn around and deny that abuse occurred. We disagree.

A recantation does not automatically render child hearsay evidence inadmissible. *See State v. Clark*, 139 Wn.2d 152, 153, 985 P.2d 377 (1999); *State v. Young*, 62 Wn. App. 895, 900, 802 P.2d 829, 817 P.2d 412 (1991); *State v. Madison*, 53 Wn. App. 754, 759, 770 P.2d 662 (1989). Instead, as with any recantation, the trial court can "weigh the credibility of a recantation against the evidence that a statement is reliable." *State v. Young*, 160 Wn.2d 799, 808, 161 P.3d 967 (2012).

Here, DE's recantation came nine months after his original disclosures. And it is reasonable, given DE's family's strong, emotional reactions to the disclosures, that DE was under considerable pressure to recant. Accordingly, the trial court did not abuse its discretion when it admitted the hearsay evidence despite DE's recantation. *See Madison*, 53 Wn. App. at 759.

### 8. Summary

We acknowledge that some of the trial court's findings were erroneous or could have been stated differently. But for the child hearsay statements to be admissible, the trial court must find only that the *Ryan* factors are substantially met. *Kennealy*, 151 Wn. App. at 881. And the

standard of review is abuse of discretion. *Id.* at 879. We hold that an analysis of the *Ryan* factors establishes that the trial court did not abuse its discretion in ruling that DE's hearsay statements were admissible.

CONCLUSION

We affirm EA's adjudication of guilt.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, P.J.

We concur:

LEE, J.

VELJACIC, J.